724 F.Supp. 15 (1989)
UNITED STATES of America, Plaintiff,
v.
KAYSER-ROTH CORPORATION, Defendant.
Civ. A. No. 88-0325B.
United States District Court, D. Rhode Island.
October 11, 1989.
*16 Michael P. Iannotti, Asst. U.S. Atty., D.R.I., Providence, R.I., Cynthia S. Huber, Asst. U.S. Atty., U.S. Dept. of Justice, Washington, D.C., for plaintiff.
Deming E. Sherman, Edwards & Angell, Providence, R.I., for defendant.

OPINION
FRANCIS J. BOYLE, Chief Judge.
In the somnolent village of Forestdale, Rhode Island, the ground waters run deep. Unfortunately, the waters also contain pollutants. Having long been home to machining and textile manufacturing industries, *17 Forestdale found itself a victim of its own hospitality. Trichloroethylene, sometimes a by-product of those industries, had filtered into Forestdale's private and public residential water wells. The Government alleges that Stamina Mills, Inc., a defunct textile operation, was a source of the contaminant.
In a slight twist on a biblical passage, the Court in this case must also decide whether the sins of the son should be visited upon the father. Cf. Exodus 20:5. Specifically, the issue is whether Kayser-Roth Corporation, the parent corporation and sole shareholder of Stamina Mills, Inc., is responsible for clean-up and response costs generated at least in part by a spill of a hazardous substance on its subsidiary's property in 1969. The answer to that query requires not only a journey through the labyrinth of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), but thorough examination of the relationship between the related corporations as well.

FACTS

Release and Response
Stamina Mills, Inc. was a textile manufacturing operation in North Smithfield, Rhode Island from approximately 1952 to 1975. The mill building had been on the site since some time in the last century. It is located on the north side of the Branch River. The Branch River flows west to east at the site. The company employed a soap scouring system to remove oil and dirt from newly-woven fabric. Because of complaints involving discharge into and pollution of the Branch River, Stamina Mills replaced the soap scouring system with one that used trichloroethylene ("TCE") in March 1969. Tanker trucks delivered the TCE which was pumped into a storage tank. During one delivery before November 1969, a mishap occurred; a tanker driver improperly attached a hosing coupling and spilled an indeterminate number of gallons of TCE. In addition to this accidental release of TCE, there is evidence that Stamina Mills would deposit used quantities of TCE bottoms in a landfill on its property. One witness, a Rhode Island Department of Health employee, testified that he saw a truck back up to the landfill and dump a purplish fluid with oily texture. The same witness also stated that the odor of TCE emanated from Stamina Mills' building.
In August 1979, ten years after Stamina Mills began to use TCE, the Rhode Island Department of Health conducted a survey of drinking water supplies in the Forestdale area, which is generally north and northwest of the Stamina property. The survey found that residential wells north of the Stamina Mills site had elevated levels of TCE. In September 1982, the Environmental Protection Agency ("EPA") completed a hydrogeological study of the area which concluded that the Stamina Mills site was a source of the contaminant. The study found a hydraulic connection between the Stamina Mills site and the residential wells. Although the flow of water through the bedrock aquifer was from north to south, normal pumping of the residential wells would reverse the flow. Consequently, the site was added to the National Priorities List the following September, making Superfund monies available for response actions.
There was evidence introduced that the residential wells might have been contaminated by sources other than Stamina Mills. The potential sources included Amperex and other companies that were located on the opposite bank of the Branch River south of the Stamina Mills site. There was no evidence that other sources did, in fact, contribute to the pollution. The EPA did not investigate potential sources of contamination other than Stamina Mills.
The EPA conducted remedial measures at both the Stamina Mills site and the residential wells. The parties have stipulated that the EPA incurred $660,612.71 in costs related to removal and enforcement activities. In addition, the parties have agreed that the Department of Justice (DOJ) spent $185,879.62 for enforcement activities. The record fails to reflect any distinction between costs related to "on-site" clean-up *18 (at the Stamina Mills site) and "off-site" clean-up (at the residential wells).

Corporate Relationships
Stamina Mills, Inc. has expired. Its parent corporation, or more accurately, the parent's successor,[1] remains in the form of the Kayser-Roth Corporation. Before Stamina Mills' dissolution, the two corporations shared a common history.
In 1961, Crown Textile Manufacturing Company ("Crown") and Samuel M. Staymen each owned 50% of the shares of Stamina Mills. Three years later Crown merged into Colonial Corporation of America ("Colonial"), and a new subsidiary of Colonial, Crown Textile Mfg. Co. ("Crown Mfg."), was incorporated and organized to run the business of Crown. Colonial retained the 50% stock interest in Stamina Mills.
In 1965, Colonial acquired Samuel M. Staymen's shares, thus becoming the sole stockholder of Stamina Mills. The following year Colonial merged with Kayser-Roth; Kayser-Roth was the surviving corporation. Kayser-Roth was therefore the owner of all the capital stock of both Crown Mfg. and Stamina Mills. Both subsidiaries, along with many other corporations, were part of Kayser-Roth's "Crown Division", a designation created for internal organization purposes only. Kayser-Roth remained the sole stockholder of Stamina Mills until its dissolution on December 31, 1977. Pursuant to the dissolution plan, Kayser-Roth received Stamina Mills' assets and assumed "all liabilities and obligations" of Stamina Mills. See Plaintiff's Exhibit No. 53 (Resolution of Stamina Mills' shareholders).
As might well be expected, the two corporations shared common officers nominated and appointed by Kayser-Roth. The common officers of Kayser-Roth and Stamina Mills included:

 KAYSER-ROTH STAMINA
 MILLS
Norman A. Jackson Financial Financial
 Vice-President Vice-President
 1966-75 1966-75
 KAYSER-ROTH STAMINA
 MILLS
James I. Spiegel President Vice-President
 1976-83 1976-77
Harold L. Glasser Vice-President Vice-President
 and Secretary and Secretary
 1966-81 1966-77
P.J. McNichol Treasurer Asst. Treasurer
 1966-71 1966-71
Robert Zimring Treasurer Asst. Treasurer
 1971-75 1971-77
Norman S. Beier Vice-President Asst. Secretary
 and Asst. 1976-77
 General Counsel
 1975-83

Moreover, and probably of greater significance, Kayser-Roth and Stamina Mills shared common directors, again nominated and appointed by Kayser-Roth, including Chester H. Roth, Alfred P. Slaner, Norman A. Jackson, Harold L. Glasser, David J. Roth, and James I. Spiegel. These individuals were officers of Kayser-Roth at the time they were also directors of Stamina Mills.
Kayser-Roth and its Crown Mfg. Division exerted practical total influence and control over Stamina Mills' operations. Kayser-Roth required Stamina Mills, after obtaining Crown Mfg. Division's approval, to obtain Kayser-Roth's approval in almost all its activities including purchase or movement of capital assets; leasing, buying, or selling real estate; borrowing money; and its budgets. The fiscal operations were completely in the control of Kayser-Roth including accounting supervision, payment of bills, collection of accounts receivable and executive compensation. Stamina Mills' officers did participate in union negotiations but this was simply a bargaining ploy since Kayser-Roth had to approve the ultimate collective bargaining agreement. Three former presidents of Stamina Mills each testified that they played little or no role in major decisions affecting Stamina Mills, except with respect to the local details of operating the factory. Kayser-Roth essentially was in charge in practically all of Stamina's operational decisions, including those involving environmental concerns. Kayser-Roth made the ultimate decision to acquire the dry cleaning process using TCE. Moreover, Kayser-Roth issued a directive requiring Stamina Mills to *19 notify the Kayser-Roth Legal Department of any correspondence with courts or governmental agencies regarding environmental matters. The only autonomy given the officers of Stamina Mills was that absolutely necessary to operate the facility on-site from day to day such as hiring and firing hourly employees and ordering inventory. Stamina was in fact and effect the serf of Kayser-Roth.

LAW
CERCLA, enacted in 1980, allocates responsibility for the clean-up of releases and threatened releases of hazardous materials into the environment. 42 U.S.C. §§ 9601-9675.[2] A responsible party is strictly, jointly and severally liable for costs incurred for removal or remedial action as well as for damages for injury to or loss of natural resources. Id. at § 9607(a). Cf. O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir.1989) (damages apportioned only if defendant demonstrates harm divisible). Because CERCLA liability is strict, a party will be held responsible upon proof that: (1) a release or threat of a release of a hazardous substance occurred; (2) the government or other authorized party incurred response costs as a result of the release, and (3) the party falls into one of the four categories of responsible parties. Id. The four categories are: (1) the current owner or operator of the site; (2) any former owner or operator of the site at the time of the release or threatened release; (3) a transporter of hazardous materials which are released; and (4) a generator of hazardous waste. Id. The Government claims that Kayser-Roth and Crown Mfg. were owners and operators of Stamina Mills at the time of the TCE release.
CERCLA's definition of "owner or operator" is not especially illuminating. In terms of an expanded definition, it states that "in the case of an onshore facility ..., any person owning or operating such facility" qualifies as an owner or operator. 42 U.S.C. § 9601(20)(A)(ii).[3] The term "person" expressly includes corporations. Id. at § 9601(21). CERCLA does provide that the term "owner or operator" does not include "a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his security interest in the ... facility." Id. at 9601(20)(A). Courts have generally concluded that these provisions confer a subsidiary's liability upon its parent in two situations. The first occurs when the parent dominates the subsidiary to such an extent that the corporate form ought to be ignored and the corporate veil pierced. The second situation takes place where a stockowner participates directly in the management of a facility, although not to the extent that allows a piercing of the corporate veil.

CHOICE OF LAW
As a preliminary matter, the Court must resolve which law to apply. It is firmly established "that when a federal statute is silent as to the choice of law to be applied, but overriding federal interests exist, courts should fashion uniform rules of decision." United States v. Nicolet, 712 F.Supp. 1193, 1201 (E.D.Pa.1989) (citing Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67, 63 S.Ct. 573, 574-75, 87 L.Ed. 838 (1943)). CERCLA, by promoting environmental protection, certainly seeks to further an overriding federal interest. One court has noted in terms that are logically overwhelming that:
[i]n attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide problem. One can hardly imagine a federal program more demanding of national uniformity than environmental protection. *20 Congress did not intend that the ability of the executive to fund the clean up of hazardous waste sites should depend on the attitudes of the several states toward parent-subsidiary liability in general, or CERCLA in particular. The need for a uniform federal rule is especially great for questions of piercing the corporate veil, since liability under the statute must not depend on the particular state in which a defendant happens to reside.
In re Acushnet River & New Bedford Harbor Proceedings, 675 F.Supp. 22, 31 (D.Mass.1987). Accordingly, a uniform federal rule of decision should be applied in CERCLA cases involving alter ego liability.
Courts framing a federal rule concerning the piercing of the corporate veil in CERCLA cases have isolated a number of factors. These factors include:
(1) inadequate capitalization in light of the purposes for which the corporation was organized, (2) extensive or pervasive control by the shareholder or shareholders, (3) intermingling of the corporation's properties or accounts with those of its owner, (4) failure to observe corporate formalities and separateness, (5) siphoning of funds from the corporation, (6) absence of corporate records, and (7) nonfunctioning officers or directors.
Id. at 33. The presence or absence of any particular factor, however, is not dispositive. The general rule is that "`a corporate entity may be disregarded in the interest of public convenience, fairness and equity.'" Alman v. Danin, 801 F.2d 1, 3 (1st Cir.1986) (quoting Capital Tel. Co. v. FCC, 498 F.2d 734, 738 (D.C.Cir.1974)); Town of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir.1981) (quoting Capital Tel. Co. v. FCC, 498 F.2d 734, 738 (D.C.Cir. 1974)). The factors simply add flesh to that proposition.
Not surprisingly, this federal common law borrows heavily from state law. Hence, these considerations do not radically differ from Rhode Island law. See, e.g., Miller v. Dixon Indus. Corp., ___ R.I. ___, ___, 513 A.2d 597, 604 (R.I.1986) (to pierce the corporate veil "where a parentsubsidiary relationship is involved, it must be demonstrated that the parent dominated the finances, policies, and practices of the subsidiary"). Indeed, courts confronting this choice of law issue have observed that the distinction between state law and a federal rule of decision is of little practical difference. In re Acushnet River, 675 F.Supp. at 33.

Liability Without Piercing the Corporate Veil
A parent corporation that controls the management and operations of its wholly owned subsidiary can be held responsible for its subsidiary's CERCLA liability without piercing the corporate veil. E.g., Idaho v. Bunker Hill Co., 635 F.Supp. 665, 671-72 (D. Idaho 1986). Cf. New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir.1985) (individual stockholder liable as operator); United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 744 (8th Cir.1986) (same). But see Joslyn Corp. v. T.L. James & Co., 696 F.Supp. 222, 224-25 (W.D.La.1988) (parent corporation cannot be held liable under CERCLA unless corporate veil is pierced). While courts have reached this conclusion by finding that the parent corporation was a de facto operator of the subsidiary, they have used two slightly different approaches.
One line of cases holds that a stockholder who manages the corporation may incur CERCLA operator liability. E.g., Shore Realty, 759 F.2d at 1052; United States v. Northeastern Pharmaceutical and Chemical Co., 579 F.Supp. 823, 848 (W.D.Mo. 1984), aff'd, 810 F.2d 726 (8th Cir.1986). These cases note that the definition of operator or owner excludes "a person, who without participating in the management of a ... facility, holds indicia of ownership primarily to protect his securing interest in the ... facility." 42 U.S.C. § 9601(20)(A). Reasoning that this exception implies that a person who holds indicia of a corporation's ownership and who participates in its management can be an owner or operator, the courts have concluded that stockholders *21 participating in management can be liable. Shore Realty, 759 F.2d at 1052; Northeastern Pharmaceutical, 579 F.Supp. at 848.
Other cases support a second theory. A stockholder, parent corporation, or any person associated with a facility whether he or she has any ownership interest or not, may be held liable if that person (including a corporate entity) controls the management and operation of the polluting corporation. This approach focuses primarily on control.
Federal common law is emerging to determine whether a parent corporation, individual stockholder, or sister subsidiary for that matter, may be held directly liable as an operator. See Northeastern Pharmaceutical, 810 F.2d at 743-44 (individual stockholder); Shore Realty, 759 F.2d at 1052 (individual stockholder); Vermont v. Staco, Inc., 684 F.Supp. 822, 831 (D.Vt. 1988) (sister subsidiary); Bunker Hill, 635 F.Supp. at 672 (parent corporation). To be held directly liable as an operator, courts have considered a number of factors including: whether the person or corporation had the capacity to discover in a timely fashion the release or threat of release of hazardous substances; whether the person or corporation had the power to direct the mechanisms causing the release; and whether the person or corporation had the capacity to prevent and abate damages. See Bunker Hill, 635 F.Supp. at 671-72.

THEORIES OF LIABILITY
Stamina Mills is not a party to this action although it is clearly an owner and operator of a facility that released a hazardous substance into the environment. Cf. Levin Metals Corp. v. Parr-Richmond Terminal Co., 817 F.2d 1448 (9th Cir.1987) (affirming dismissal of CERCLA action brought against dissolved corporation). The United States, however, has proceeded against Stamina Mills' former parent corporation, Kayser-Roth. The Government argues no less than six different theories of liability.
First, the Government contends that Kayser-Roth, because of its control over Stamina Mills, was actually an operator of the site at the time of release. Second, the Government suggests that Crown Mfg. was an operator of the Stamina Mills site and that Kayser-Roth has assumed all of Crown Mfg.'s liabilities. Third, the Government contends that Kayser-Roth succeeded to the liabilities of Stamina Mills by continuing its operations. Fourth, the Government argues that Kayser-Roth implicitly and expressly assumed the liabilities of Stamina Mills. Fifth, the Government suggests that the corporate veil of Stamina Mills be pierced to find Kayser-Roth responsible for Stamina Mills' obligations. Finally, the Government contends that the same theory is available to hold Crown Mfg. liable for Stamina Mills' violations, and that Kayser-Roth is ultimately responsible because it assumed the liabilities of Crown Mfg.
Kayser-Roth denies that it should be held liable for the acts of Stamina Mills. Defendant avers that it and its subsidiary, Crown Mfg., did not own or operate the Stamina Mills site within the scope of the statute. With respect to Kayser-Roth's assumption of Stamina Mills' liabilities upon dissolution, Kayser-Roth posits that the General Laws of Rhode Island, Section 7-1.1-98, which provides that suits against dissolved corporations must be brought within two years of the corporation's demise, protects it against a suit brought more than ten years after Stamina Mills' dissolution.
Moreover, Defendant rejects the theory that the veil of Stamina Mills ought to be pierced to pursue the real culprit. Defendant also contends that Amperex and other hazardous waste sites in the area were the actual sources of TCE contamination in the Forestdale wells.

ISSUES
The parties have stipulated to a number of material facts. Defendant has admitted that the 1969 spill of TCE occurred and that this constitutes a release. Furthermore, Defendant also admits that TCE is a hazardous material and that Stamina Mills qualifies as a facility under CERCLA. Finally, the parties stipulate as to certain *22 response costs, although the division between on-site and off-site costs is disputed.
The parties disagree over two major issues. The first is whether Kayser-Roth can be held responsible for Stamina Mills' actions. The second involves causation: Defendant asserts that even if it is liable for Stamina Mills' release, the 1969 spill did not contaminate the residential wells. Rather, Defendant argues that other sources, including a company known as Amperex, are the actual polluters of the Forestdale wells and therefore Stamina Mills' release did not result in off-site response costs. Each issue will be addressed in turn.

DISCUSSION

Parent Liability: Parent as Operator
Ordinarily, a parent corporation cannot be deemed an operator based solely upon its status as a shareholder. The fact that the subsidiary was a member of the classes of persons potentially liable under CERCLA and that the parent had a substantial ownership interest in the subsidiary is insufficient to establish that the parent was an operator for CERCLA's purposes. Cf. Bunker Hill, 635 F.Supp. at 672. The parent corporation's control over the subsidiary's management and operations is an essential element of proving operator liability on the parent's part. See id. Cf. Shore Realty, 759 F.2d at 1052; Northeastern Pharmaceutical, 810 F.2d at 744.
Kayser-Roth's liability as an operator turns on the issue of control. It is uncontroverted that Stamina Mills was within the class of those potentially liable under CERCLA. Similarly, it is undisputed that Kayser-Roth, as sole owner and shareholder of Stamina Mills, had a substantial financial and ownership interest in Stamina Mills. The question becomes whether Kayser-Roth exercised control over Stamina Mills management and operations sufficient to find that Kayser-Roth was a de facto operator.
The evidence establishes that Kayser-Roth was indeed an operator for purposes of CERCLA.[4] Kayser-Roth exercised pervasive control over Stamina Mills through, among other things: 1) its total monetary control including collection of accounts payable; 2) its restrictions on Stamina Mills' financial budget; 3) its directive that subsidiary-governmental contact, including environmental matters, be funneled directly through Kayser-Roth; 4) its requirement that Stamina Mills' leasing, buying or selling of real estate first be approved by Kayser-Roth; 5) its policy that Kayser-Roth approve any capital transfer or expenditures greater than $5,000; and finally, 6) its placement of Kayser-Roth personnel in almost all Stamina Mills' director and officer positions, as a means of totally ensuring that Kayser-Roth corporate policy was exactly implemented and precisely carried out. These are only examples of Kayser-Roth's practical total control over Stamina Mills' operations.
Illustrative of Kayser-Roth's control are its actions with regard to environmental matters affecting Stamina Mills. Kayser-Roth had the power to control the release or threat of release of TCE, had the power to direct the mechanisms causing the release, and had the ultimate ability to prevent and abate damage. Kayser-Roth knew that Stamina Mills employed a scouring system that used TCE; indeed, Kayser-Roth approved the installation of that system after mandating that a cost-benefit study be made by Stamina Mills. Kayser-Roth not only had the capacity to determine the use of TCE but also was able to *23 direct Stamina Mills on how the TCE should have been handled.[5] There are other examples of Kayser-Roth's participation in Stamina Mills' environmental decision-making. Evidence was introduced that Kayser-Roth issued a directive to its subsidiaries, including Stamina Mills, requiring that Kayser-Roth's Legal Department be notified of any governmental agency or court contact regarding environmental matters. Furthermore, when Stamina Mills was sued in 1974 by the United States for an illegal waste water discharge into the Branch River, the final decision on settlement was made by Kayser-Roth's directors.
Although not singularly determinative on the issue of operator liability, these factors along with Kayser-Roth's other acts of pervasive control over Stamina Mills, warrant a finding that Kayser-Roth was an "operator" for CERCLA purposes within the provisions of 42 U.S.C. § 9607(a).

Parent Liability: Piercing the Corporate Veil
CERCLA liability based upon piercing the corporate veil is a species of owner, rather than operator, liability. While an owner may be, in most cases, an operator, the converse is not necessarily true. Imputing CERCLA liability upon a parent corporation by piercing the corporate veil is, in essence, concluding that the parent is an owner for CERCLA's purposes. "`The effect of piercing a corporate veil is to hold the owner ... liable. The rationale for piercing the corporate veil is that the corporation is something less than a bona fide independent entity.'" Northeastern Pharmaceutical, 810 F.2d at 744 (quoting Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir.1978)) (emphasis added). Upon analysis of the factors relevant to piercing Stamina Mills' veil, and mindful of the liberal construction CERCLA must be afforded so as not to frustrate probable legislative intent, the Court concludes that Kayser-Roth is an owner for CERCLA's purposes.
An analysis of piercing Stamina Mills' veil to hold Kayser-Roth liable begins with the general proposition that a corporate entity may be disregarded in the interest of public convenience, fairness and equity. As the First Circuit has stated:
... [F]ederal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form ... an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine....
Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986) (quoting Town of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir.1981)).
CERCLA's language attempts to address nationwide public health and environmental problems. In fashioning a remedial framework by which some of these problems could be resolved, Congress had two basic purposes in mind:
First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.
Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting United States v. Reilly Tar & Chemical Corp., 546 F.Supp. 1100 (D.Minn.1982)). CERCLA's provisions should thus be viewed expansively, so as not to frustrate these "beneficial legislative purposes."[6]Id.; Shore Realty, 759 F.2d *24 at 1045. It is against this backdrop that it is concluded that CERCLA places no special importance upon the corporate structure. See United States v. Mottolo, 695 F.Supp. 615, 624 (D.N.H.1988).
Kayser-Roth has exhibited overwhelming pervasive control over Stamina Mills. Many of the same factors used in holding Kayser-Roth liable as an operator are relevant. Kayser-Roth's control over environmental matters; its policy of approving all capital expenditures of greater than $5,000; its stranglehold on income and expenses; its practice of placing Kayser-Roth personnel in Stamina Mills' director positions, thereby precluding other Stamina Mills executives from significant daily decision-making; and its overwhelming control over Stamina Mills' financial and operational structure add flesh to the skeletal proposition that Kayser-Roth's corporate existence should be disregarded.[7] Accordingly, Stamina Mills' veil should be pierced to hold Kayser-Roth liable, not only because public convenience, fairness, and equity dictate such a result, but also due to the all encompassing control which Kayser-Roth had over Stamina Mills as, in fact and deed, an owner. Any other result would provide too much solace to deliberate polluters, who would use this device as an escape.

Causation
Kayser-Roth contends that even if it is liable for Stamina Mills' release of TCE, that release did not contaminate the Forestdale wells. Absent a causal connection between Stamina Mills' release and the Forestdale wells contamination, Kayser-Roth asserts it bears no responsibility for the off-site response costs. While there might be some doubt if the 1969 spill were the only release, it ignores the credible evidence of TCE being continually dumped on Stamina Mills' property. In the beginning, there were inordinately high concentrations of TCE on the Stamina Mills' property. There was ample evidence to support the fact that once dumped on Stamina Mills' property the TCE migrated to the Forestdale wells. A hydrogeological study established a hydraulic connection between the Stamina Mills site and the residential wells. The relationship between the concentration on the Stamina Mills' property and the plume overspreading the residential area clearly established that the Stamina Mills property is a source of pollution. See 42 U.S.C. § 9607(a). Thus, the releases from the Stamina Mills site were the cause of both the on-site and off-site response costs.
Kayser-Roth also argues that other sources were responsible for the contamination of the residential wells. Specifically, Kayser-Roth accuses Amperex, a southern neighbor, of contributing to the pollution. This argument, however, ignores CERCLA's joint and several liability scheme. "[D]amages should be apportioned only if the defendant can demonstrate the harm is divisible." O'Neil v. Picillo, 883 F.2d at 178-79. Kayser-Roth did not introduce any evidence concerning the divisibility of the TCE contamination. Indeed, on this record it is sheer speculation to suggest that there was any other source of TCE. There was evidence that Amprex used TCE but no evidence that its TCE migrated under the Branch River to the Stamina site or the Forestdale wells. In the absence of that evidence Kayser-Roth is itself liable for all on-site and offsite damages the Government has proven.

Damages
The parties stipulated to certain costs the Government incurred in a document titled "First Joint Stipulation As To Costs." Specifically, the parties agreed that costs incurred by the EPA totalling $660,612.71 were "`costs of removal or remedial action' within the meaning of 42 U.S.C. § 9607(a)." First Joint Stipulation As To Costs 1-2. Moreover, it was stipulated that costs incurred by the Department of Justice totalling $185,879.62 were also "`costs of removal or remedial action' within the meaning of 42 U.S.C. § 9607(a)." Id. at 2. The total costs the Government incurred and paid as a result of the release was therefore *25 $846,492.33. As noted earlier, the record fails to reflect any distinction between on-site and off-site costs. Because Kayser-Roth is liable for both on-site and off-site costs, the distinction is immaterial.
Accordingly, Kayser-Roth is found liable for $846,492.33. In addition, the United States is entitled to recover interest from the later of the date of the written demand for payment of a sum certain or the date of a particular expenditure. 42 U.S.C. § 9607(a). Finally, the Government shall within 10 days prepare and present a form of declaratory judgment holding Kayser-Roth liable for future response costs related to on-site and off-site clean-up. Id. at § 9613(g)(2).
SO ORDERED.
NOTES
[1] Since the expiration of Stamina Mills, Inc., Kayser-Roth has been involved in a merger; immediately after the merger, however, the new entity was renamed Kayser-Roth Corporation.
[2] CERCLA as initially enacted encompassed 42 U.S.C. §§ 9601-9657. In 1986, the Superfund Amendments and Reauthorization Act (SARA) was passed, which provided additional funding and repealed certain sections while adding certain other sections. See 95 Pub.L. No. 99-499, 100 Stat. 1613 (1986). The statute, as amended, now comprises 42 U.S.C. §§ 9601-9675.
[3] The term "facility" is defined at 42 U.S.C. § 9601(9). The parties have stipulated that Stamina Mills was a facility.
[4] Because the Court finds Kayser-Roth responsible for any CERCLA liability of Stamina Mills on an operator theory and, as discussed later, a "piercing" theory, it need not address the thorny issue of whether Kayser-Roth, or Crown Mfg. for that matter, assumed, expressly or implicitly, the CERCLA liability of Stamina Mills at the time of its dissolution. Having dissolved prior to the statute's enactment in 1980, Stamina Mills' potential CERCLA liability was, of course, unknown at the time. Cf. Great Am. Ins. Co. v. Byrd & Watkins Constr., Inc., 630 F.2d 460 (6th Cir.1980) (upon corporation's dissolution, shareholders pledged to assume all liability, known or unknown, of corporation).
[5] Actual knowledge of the release is not required for CERCLA liability; CERCLA is a strict liability scheme. O'Neil v. Picillo, 883 F.2d at 182 n. 9.
[6] The Dedham Water court further stated that "`[W]e will not interpret section 9607(a) in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intent otherwise.'" Dedham Water, 805 F.2d at 1081 (quoting New York v. Shore Realty, 759 F.2d 1032, 1045 (2d Cir.1985)).
[7] One version of the "Golden Rule" is that he who has the Gold rules. The circumstances comport completely with this version of the "Golden Rule."