**JACKSONVILLE ELECTRIC AUTHORITY, Plaintiff,**

v.

**EPPINGER AND RUSSELL COMPANY, a New York corporation, the Bernuth Corporation, and Trustees of Tufts College, d/b/a Tufts University, a Massachusetts corporation, Defendants.**

**No. 88–873–Civ–J–16.**

United States District Court, M.D. Florida, Jacksonville Division.

Oct. 18, 1991.

---

**3.** NATIONAL OCEAN SERVICE, UNITED STATES COAST PILOT; ATLANTIC COAST: CAPE HENRY TO KEY WEST at 140

(26th ed. 1989).

Richard L. Maguire, Gen. Counsel's Office, Jacksonville, Fla., for plaintiff.

Malcolm V. McKay, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for trustees of Tufts College, Inc. (the only defendant required to file a brief in this matter).

## ORDER

JOHN H. MOORE, II, District Judge.

This cause is before the Court on Defendant Trustees of Tufts College's [1] motion

---

1. For purposes of simplicity, the Court will refer to the Defendant simply as "Tufts".

for summary judgment, filed August 19, 1991, and on Plaintiff Jacksonville Electric Authority's ["JEA"] cross-motion for summary judgment, filed September 6, 1991. Timely responses have been filed.

*Facts*

This is an action brought pursuant to the Comprehensive Environmental Response Compensation, and Liability Act, 42 U.S.C. §§ 9601–57 (1989) ("CERCLA"). Plaintiff, the current owner of the site in question, seeks to recover costs incurred to clean up contamination by creosote and arsenic on the site. The question presented here is whether Plaintiff can recover cleanup costs from Tufts, a former majority shareholder of the company which owned and operated the site from 1925 to 1942.

In 1925 and 1926, Tufts received 4,808 shares of Eppinger and Russell Company's (hereinafter "Eppinger") 5,000 shares of stock through a testamentary bequest of Dr. Austin B. Fletcher, a deceased Tufts alumnus. Tufts purchased the remaining 192 shares in 1939. In 1942, Tufts sold Eppinger to Bernuth Lembcke Co., Inc.

Eppinger was one of the first companies to enter the commercial wood preserving business, beginning in 1878. As part of the preservation process, Eppinger injected creosote into the wood under pressure in specially designed cylinders. The company's first wood-preserving plant and headquarters were located in New York. In 1909, the company constructed a second plant in Jacksonville, Florida, on property that is now owned by Plaintiff and is the subject of this lawsuit. The Jacksonville plant operated during Tufts' ownership of Eppinger.

During Tufts' period of ownership, numerous and regular reports concerning Eppinger were made to the President, Trustees, and Finance Committee of Tufts. In its capacity as majority shareholder of Eppinger, Tufts approved employment contracts between Eppinger and Eppinger's officers, and approved a profit sharing plan

for Eppinger. At various times during Tufts' ownership of the company, several trustees of Tufts also served as directors and officers of Eppinger.

Tufts had other contacts with Eppinger in its capacity as shareholder. On one occasion Tufts' President visited the Jacksonville facility. In 1935, Tufts made a sizeable demand loan to the company. In 1939 and 1940, Tufts authorized two trustees to vote the Eppinger stock by proxy. Tufts also instructed those trustees on which directors to elect, and that the company bylaws should be amended.

From 1923 to August 1941, Charles Chadwick was Eppinger's President and General Manager. Chadwick was not a trustee of Tufts. In February 1942, after Chadwick's resignation, William Cook was appointed General Manager of Eppinger, in addition to his duties as First Vice President. Like his predecessor, Cook was not a trustee of Tufts. While it is somewhat unclear who assumed the duties of the General Manager during the interim period between August 1941 and February 1942, the evidence indicates that Cook served as General Manager during this period as well.[2]

*Discussion*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). Once the moving party has met its burden, the burden of production shifts to the nonmoving party "to go beyond the

---

**2.** The minutes of Eppinger's 1942 directors meeting indicate that Cook reported on the con-

dition of the business for the year 1941.

pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c & e)). Summary judgment should be granted if the nonmoving party fails to make a showing sufficient to establish an essential element of its case. *See Celotex, supra.* The nonmoving party must demonstrate more than a mere scintilla of evidence; if the nonmoving party's evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the Court "must view the evidence presented through the prism of the substantive evidentiary burden" each party will bear at trial. *See* 106 S.Ct. at 2513.

CERCLA was enacted in response to the environmental and public health hazards caused by the improper disposal of hazardous wastes. *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1553 (11th Cir.1990). The statute attempts to place the ultimate responsibility for cleaning up hazardous waste on those entities responsible for problems caused by the disposal of hazardous waste. *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir.1990). CERCLA thus imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any ... facility at which such hazardous substances were disposed of...." 42 U.S.C. § 9607(a)(2). Plaintiff seeks to hold Tufts liable as an "owner" of the Eppinger facility by virtue of Defendant's status as the former parent corporation of Eppinger, or as an "operator" because of Defendant's alleged active participation in the management of the facility. Plaintiff has the burden of proving Tufts' liability by a preponderance of the evidence.

## I. Owner liability

 It is undisputed that Defendant never actually owned the facility in question. Eppinger owned the facility, while Defendant was the parent company of Eppinger. "The property of the corporation is its property, and not that of the stockholders, as owners." 1 C. Keating & G. O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 31, at 555 (1990), *quoted in Riverside Mkt. Dev. Corp. v. International Bldg. Products, Inc.*, 931 F.2d 327, 330 (5th Cir.1991). Absent a specific statutory directive, the Court will not impose automatic "owner" liability on a parent corporation for the acts of a subsidiary. *See Joslyn Mfg. Co. v. T.L. James & Co., Inc.*, 893 F.2d 80, 82–83 (5th Cir.1990).

In order to hold Defendant liable as an owner of the facility, the facts must justify piercing the corporate veil. *Id.* at 83. The corporate veil should be pierced to impose liability on the parent for the subsidiary's acts when the subsidiary is used as a sham to avoid direct liability. *Id.; see United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686 (5th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). Factors to be considered in determining whether the corporate veil should be pierced to reach a parent corporation are:

(1) the parent and the subsidiary have common stock ownership; (2) the parent and the subsidiary have common directors or officers; (3) the parent and the subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; and, (12) the subsidiary does not observe the basic corporation formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Jon–T Chemicals,* 768 F.2d at 691–92; *see United States Steelworkers of America v. Connors Steel Co.,* 855 F.2d 1499, 1505–06 (11th Cir.1988).

The facts of this case do not justify piercing the corporate veil. Aside from common stock ownership, common officers and common directors [3] (which are factors to be expected where the parent company owns virtually all of the subsidiary's stock), there are no facts which indicate that Defendant used Eppinger and Russell as a sham to avoid direct liability. Corporate formalities were strictly observed. The materials on file also indicate that Tufts and Eppinger did not have common business departments, did not file consolidated financial statements or tax returns, and did not combine daily operations. Tufts did not finance Eppinger, did not cause Eppinger's incorporation, and did not use Eppinger's property as its own. Eppinger did distribute dividends somewhat in excess of net earnings during Tufts' period of ownership, but there is no evidence that Eppinger was rendered unable to pay its debts or that Tufts pillaged Eppinger so as to make Eppinger the "serf" of Tufts. *Cf. United States v. Kayser–Roth Corp., Inc.,* 724 F.Supp. 15, 19 (D.R.I.1989). Accordingly, no genuine issue of material fact exists which would justify piercing the corporate veil to hold Tufts liable as an owner under CERCLA, and summary judgment on this issue will be granted for Tufts and against Plaintiff.

## II. *Operator liability*

■ Several recent cases have attempted to define the term "operator" as used in CERCLA. The Fifth Circuit has held that persons are operators under CERCLA when "they themselves actually participate in the wrongful conduct prohibited by the Act." *Riverside,* 931 F.2d at 330. In *Riverside,* the Fifth Circuit refused to impose operator liability on the former majority stockholder of a corporation that used to own an asbestos product manufacturing facility. The majority stockholder spent very

little time at the facility, and no evidence was presented to indicate that the stockholder's visits to the facility afforded him "with the opportunity to direct or personally participate in the improper disposal of asbestos or asbestos by-products." *Id.* The stockholder's participation in plant operations was "limited to reviewing financial statements and attending meetings" where he consulted with the corporate officers. *Id.* The court affirmed the trial court's grant of summary judgment for the former stockholder, holding that none of the evidence showed that the former stockholder actually participated in any conduct that violated CERCLA. *Id.*

By contrast, the district court in *Riverside* found a genuine issue for trial as to whether a minority stockholder was an operator under CERCLA. The minority stockholder took an active part in the daily operations of the facility, spending approximately 40% of his work week at the plant and negotiating contracts for the plant with suppliers of raw asbestos. *See id.* at 328. In addition, the minority stockholder worked on the plant floor supervising plant operations, and may have operated plant machines himself. *See Riverside Mkt. Dev. Corp. v. International Bldg. Products, Inc.,* No. 88–5317, 1990 WL 72249, at *3 (E.D.La. May 23, 1990).

In *United States v. Kayser–Roth Corp., Inc.,* 910 F.2d 24 (1st Cir.1990), *aff'g* 724 F.Supp. 15, 18 (D.R.I.1989), operator liability was imposed upon a parent corporation which "exerted practical total influence and control over" the subsidiary's operations. In addition to the pervasive control exercised over the subsidiary's financial operations, the parent corporation also controlled environmental matters including the decision to install the system that used the hazardous substance at issue. *Kayser–Roth,* 910 F.2d at 27. The court stated that:

> it is obviously not the usual case that the parent of a wholly owned subsidiary is an operator of the subsidiary. To be an

**3.** For purposes of this analysis, the trustees of Tufts will be considered the equivalent of "directors".

operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary.

*Id.*[4]

The Eleventh Circuit has not yet addressed the proper standard for imposing operator liability on the parent corporation of a wholly-owned subsidiary. However, in *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990), the court hinted at what actions could subject a corporation to operator liability in construing the "secured creditor exemption" to CERCLA liability. In *Fleet Factors*, the defendant was a secured creditor which held a deed of trust to the polluted land on which its debtor's factory was located. *Id.* at 1556. The defendant invoked the secured creditor exemption, which exempts from the definition of "owner or operator" a "person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A)(iii). The government alleged that, when the debtor's business began to fail, the defendant-creditor increased its involvement in the debtor's operations by requiring the debtor to seek its approval before shipping its goods to customers, establishing the price for excess inventory, dictating when and to whom the finished goods should be shipped, determining when

employees should be laid off, supervising the activity of the office administrator at the site, controlling access to the facility, and contracting to dispose of the fixtures and equipment at the site. *See* 901 F.2d at 1559. In addition, the creditor "actively asserted its control over the disposal of hazardous wastes at the site by prohibiting [the debtor] from selling several barrels of chemicals to potential buyers." *Id.* at n. 13. The Court held that this activity was "participation in management" so as to remove the defendant from the protection of the secured creditor exemption. In dicta, the court noted that the creditor's involvement would pass the threshold for operator liability as well. *Id.* at 1560. The court stated that a creditor would not incur operator liability merely by having "a capacity to influence the corporation's treatment of hazardous wastes." *Id.* at 1557.[5] The court, citing *Kayser–Roth* as "an example of activity that could subject a secured creditor to liability as an operator," *id.* at 1557 n. 10, went on to imply that operator liability will be incurred if the creditor actually involves itself in the day-to-day operations of the facility or participates in management decisions relating to hazardous waste. *Id.* at 1557–58.

■ Viewed together, *Riverside, Kayser–Roth*, and *Fleet Factors* impose operator liability on the parent corporation of a wholly-owned subsidiary when the parent exercises actual and pervasive control of

---

**4.** The *Kayser–Roth* court seemed to contradict itself when it went on to imply that a parent corporation can incur operator liability simply by virtue of its ability to control decisions about hazardous waste. *See* 910 F.2d at 27 n. 8 (stating that "indicia of ability to control decisions about hazardous waste are indicative of the type of control necessary to hold a parent corporation liable as an operator") and at 28 (quoting with approval the trial court's opinion which stated that "Kayser had the power to control the release or threat of release of TCE, had the power to direct the mechanisms causing the release, and had the ultimate ability to prevent and abate damage."). The "ability to control" language is inconsistent with the *Kayser–Roth* court's own "active involvement" test. A parent corporation will almost always have some ability to control a subsidiary's actions (including the decisions about hazardous waste), yet it will not usually be the case where the parent is

actively involved in the subsidiary's operations to the point of actually participating in and controlling the conduct which is subject to CERCLA liability. The "ability to control" language in *Kayser–Roth* is best viewed as dicta, since Kayser–Roth exercised actual control over its subsidiary's environmental decisions. *See* 910 F.2d at 27.

**5.** With respect to the secured creditor exemption, the court ruled that a lender may incur CERCLA liability "without being an operator, by participating in the financial management of a facility to a degree indicating a capacity to influence the corporation's treatment of hazardous wastes." 901 F.2d at 1557; *see also In re Bergsoe Metal Corp.*, 910 F.2d 668, 673 n. 3 (9th Cir. 1990) (interpreting *Fleet Factors* to require the exercise of actual management authority before a lender will be held liable).

the subsidiary to the extent of actually involving itself in the daily operations of the subsidiary. Actual involvement in decisions regarding the disposal of hazardous substances is a sufficient, but not a necessary, condition to the imposition of operator liability.

After reviewing all the materials on file, the Court finds that Tufts is not liable as an operator within the meaning of CERCLA. Although Tufts and Eppinger did have some common officers and directors, this is merely an example of the "concomitant general authority or ability to control" that frequently attends the parent-subsidiary relationship. *See Kayser–Roth, supra.* The materials on file demonstrate that Tufts had no material involvement in Eppinger's daily operations.

Plaintiff cites the following actions as evidence that Tufts actively involved itself in Eppinger's affairs: (1) Tufts owned all or almost all the stock in Eppinger; (2) Tufts dictated the terms of employment of Eppinger's President (Chadwick) and other executive officers; (3) Tufts' creation of a profit sharing plan for the Eppinger officers; (4) Eppinger's distribution of dividends in excess of net earnings during Tufts' period of ownership, which allegedly contributed to a situation where the equipment at the wood preserving facility was not properly upgraded and replaced; (5) Tufts' receipt of reports at Trustee meetings on the status of Eppinger's operations; (6) Tufts' alleged hiring of William Cook as Director, Vice–President, and General Manager of Eppinger; (7) statements by trustees to the effect that Tufts carried on a business at the Eppinger facility; (8) during Tufts' period of ownership, the method of wood treatment was changed from the use of arsenic salt to the use of another unspecified chemical. These contacts do not, taken as a whole or individually, amount to "active involvement" by Tufts in the operations of Eppinger beyond the general authority that derives from parent company status.

Plaintiff cannot seriously contend that this Court should impose operator liability on Tufts based on the simple fact that Tufts owned all or almost all of Eppinger's stock during the relevant period. Such a rule would impose automatic liability on the parent corporation of a wholly-owned subsidiary, a result which is not dictated by the plain language of CERCLA. In addition, the fact that Tufts and Eppinger had some common directors and officers, and that Tufts received regular financial status reports on Eppinger, merely demonstrates the concomitant general authority and *ability to control* that comes with ownership. This case stands in stark contrast to *Kayser–Roth*, where the parent corporation exercised pervasive control over the subsidiary's financial operations and gave final approval of the installation of the system that used the hazardous substance at issue in that case. *See* 910 F.2d at 27. Kayser–Roth's control over the subsidiary was so complete that the subsidiary was required to obtain Kayser–Roth's approval before making any expenditures over $5000 or before making any real estate deals. *See id.* Kayser–Roth even collected the subsidiary's account receivables. *Id.* To the contrary, the materials on file indicate that Tufts never took a similar "hands-on" approach with Eppinger. It would be extremely odd if Tufts had taken such an approach, given the vast dissimilarities between operating an educational institution and operating a creosoting plant.

The fact that Eppinger distributed dividends in excess of net earnings seems more relevant, if at all, to whether Tufts should be held liable as an owner than as an operator of the Eppinger facility. In any event, Plaintiff has submitted no evidence to corroborate the suggestion that the distribution of dividends caused the Eppinger facility to be improperly maintained, and no evidence has been presented that the facility's equipment was not properly upgraded and replaced.

One area of major disagreement between the parties is the role of William Cook in the operations of Eppinger and his relation to Tufts. At a time when Tufts was interested in selling Eppinger, Cook was an engineer hired to commission a survey and report on Eppinger's properties and business. At Chadwick's suggestion, Cook was

made a director of Eppinger. *See* Plaintiff's ex. 18. Cook also became a Vice–President and the General Manager of Eppinger. As General Manager, Cook was responsible for the "proper operation, maintenance, and repair" of both Eppinger facilities. *See* Plaintiff's ex. 10.

Plaintiff cites an off-hand quote by a Tufts trustee to the effect that Cook was to be the "direct representative" of Tufts. *See* Plaintiff's ex. 18. The evidence on file, viewed as a whole, indicates otherwise. It is true that Tufts and Eppinger had some common officers and directors. However, Cook was not a trustee of Tufts. Also, the minutes of Eppinger's 1942 director's meeting clearly show that Cook was the person responsible for the operation of the Jacksonville facility during his tenure as General Manager. While the minutes of the 1942 meeting indicate that Cook was subject to the general supervision of Eppinger's officers and directors, *see* Plaintiff's ex. 10, it was Cook who was directly responsible for operating and maintaining the facility, making contracts for creosoting and transportation, and the purchase and installation of plant equipment and supplies. *Cf. Riverside*, 931 F.2d at 328–30.[6]

This case must again be contrasted with the situation in *Kayser–Roth.* In *Kayser–Roth*, the subsidiary, Stamina Mills, Inc., was a textile manufacturing operation. Kayser–Roth had been in the textile manufacturing business for at least several years due to its acquisition of another textile manufacturing company. When Kayser–Roth subsequently acquired Stamina Mills, Kayser–Roth had substantial knowledge about running a textile business, and implemented its own corporate policy by placing Kayser–Roth personnel in Stamina Mills' director and officer positions. *See* 724 F.Supp. at 17–19.

The relationship that existed between Tufts and Eppinger is simply not comparable to that in *Kayser–Roth.* Tufts was,

and is, an institution of higher learning. Eppinger was in the wood treatment business, a field largely foreign to Tufts. There is simply no evidence that the Tufts trustees who served as Eppinger directors and officers actually involved themselves in the daily operational decisions of the Eppinger business.[7] Defendant has thus met its burden of showing, by reference to materials on file, that no genuine issue of material fact exists. Plaintiff has failed to make a showing sufficient to establish an essential element of its case.

Accordingly, it is now

ORDERED AND ADJUDGED:

Tufts' motion for summary judgment is granted. Plaintiff's cross motion for summary judgment is denied. Summary judgment is hereby granted for Tufts and against Plaintiff.

DONE AND ORDERED.

---

6. It is also reasonable to assume that Chadwick had similar responsibilities during the lengthy period during which he was the General Manager.

7. The Court recognizes that, due to the remoteness in time of these events, evidence of actual operational control may be impossible to find. However, the Court cannot simply infer operational control on the part of Tufts from the record presented in this case.