**JACKSONVILLE ELECTRIC AU-THORITY, Plaintiff, Counter–Defendant–Appellant,**

v.

**BERNUTH CORPORATION; Eppinger & Russell Company, a New York Corporation, Defendants–Counter–Claimants, Cross–Claimants, Third Party Plaintiffs, Counter–Defendants, Cross–Claim Defendants.**

**TRUSTEES OF TUFTS COLLEGE, INC., d/b/a Tufts University, Defendant, Cross–Claim Defendant, Cross–Claimant, Counter–Claimant–Appellee,**

v.

**SOUTHERN REGION INDUSTRIAL REALTY COMPANY, Third–Party Defendant, Counter–Claimant.**

No. 92–2169.

United States Court of Appeals, Eleventh Circuit.

July 30, 1993.

James Lee Harrison, Daniel Deon Richardson, Richard L. Maguire, Gregory Keith Radlinski, and Rogers, Towers, Bailey, Jones & Gay, Jacksonville, FL, for appellant.

Malcolm V. McKay and Spencer M. Punnett II, Roger D. Schwenke, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, FL, for Tufts.

Richard A. Marshall, Jr., Miami, FL, for defendants.

James Edgar Cobb, Peek & Cobb, Jacksonville, FL and Eileen Crowley, Branch, Pike & Ganz, Atlanta, GA, for Southern Region, Third Party, defendant.

Before COX, Circuit Judge, MORGAN and HENDERSON, Senior Circuit Judges.

PER CURIAM:

The only issue in this appeal is whether there is sufficient evidence in the record to support the claim of the appellant, Jacksonville Electric Authority ("JEA"), that the appellee, Trustees of Tufts College d/b/a Tufts University ("Tufts"), operated a wood treatment facility more than fifty years ago on property now occupied by JEA so as to require contribution by Tufts for "cleanup" costs of the land as provided in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). After cross motions for summary judgment were filed by the parties, the United States District Court for the Middle District of Florida granted Tufts' motion and denied the motion of JEA. *Jacksonville Elec. Auth. v. Eppinger & Russell Co.*, 776 F.Supp. 1542 (M.D.Fla.1991). JEA appeals that portion of the district court judgment holding that Tufts was not the operator of the facility. We affirm.

## I. BACKGROUND

### A. Facts

As stated, JEA brought this action to recover the costs it incurred in cleaning up creosote and arsenic contamination on its property. The land is the former site of a wood treatment plant owned by Eppinger & Russell Company ("Eppinger"). In 1925 and 1926 Tufts received 4,808 of Eppinger's 5,000 shares through a testamentary gift of an alumnus of the institution. In 1939 the school purchased the remaining 192 shares. It then sold all of its shares in Eppinger to Bernuth Lembcke Co., Inc. in 1942 and has not had any ownership interest in Eppinger since that date.

In its order granting summary judgment to Tufts the district court recited the following facts:

Eppinger was one of the first companies to enter the commercial wood preserving business, beginning in 1878. As part of the preservation process, Eppinger injected creosote into the wood under pressure in specially designed cylinders. The company's first wood-preserving plant and headquarters were located in New York. In 1909, the company constructed a second plant in Jacksonville, Florida, on property that is now owned by Plaintiff and is the subject of this lawsuit. The Jacksonville

plant operated during Tufts' ownership of Eppinger.

During Tufts' period of ownership, numerous and regular reports concerning Eppinger were made to the President, Trustees, and Finance Committee of Tufts. In its capacity as majority shareholder of Eppinger, Tufts approved employment contracts between Eppinger and Eppinger's officers, and approved a profit sharing plan for Eppinger. At various times during Tufts' ownership of the company, several trustees of Tufts also served as directors and officers of Eppinger.

Tufts had other contacts with Eppinger in its capacity as shareholder. On one occasion Tufts' President visited the Jacksonville facility. In 1935, Tufts made a sizeable demand loan to the company. In 1939 and 1940, Tufts authorized two trustees to vote the Eppinger stock by proxy. Tufts also instructed those trustees on which directors to elect, and that the company bylaws should be amended.

From 1923 to August 1941, Charles Chadwick was Eppinger's President and General Manager. Chadwick was not a trustee of Tufts. In February 1942, after Chadwick's resignation, William Cook was appointed General Manager of Eppinger, in addition to his duties as First Vice President. Like his predecessor, Cook was not a trustee of Tufts. While it is somewhat unclear who assumed the duties of the General Manager during the interim period between August 1941 and February 1942, the evidence indicates that Cook served as General Manager during this period as well.

*Id.,* at 1544.

### B. Procedural History

Because the events in issue occurred such a long time ago, the only useful evidence consists of ancient documents prepared contemporaneously with the events concerning this time period. All those documents were submitted to the district court for its consideration in ruling on the cross motions for summary judgment. The court reviewed this record and found insufficient evidence to establish Tufts' liability either as the owner or operator of the Eppinger establishment. Because JEA appeals only that portion of the district court's judgment relating to Tufts' role as operator, we do not address the ownership issue.[1]

## II. STANDARD OF REVIEW

■ We review the district court's grant of summary judgment *de novo. United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1553 (11th Cir.1990); *see also Useden v. Acker,* 947 F.2d 1563, 1573 (11th Cir.1991). If the evidence submitted to the court is insufficient to support JEA's claim that Tufts was the operator of the Eppinger plant, then summary judgment may be properly granted in favor of Tufts. *Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc.,* 931 F.2d 327, 329 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991). We make that determination in light of JEA's substantive burden of proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254–55, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990).

## III. DISCUSSION

Section 9607(a) of CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for [cleanup costs]." 42 U.S.C. § 9607(a). An "operator" is simply defined as a person operating a facility. 42 U.S.C. § 9601(20)(A)(ii). Unfortunately, Congress did not elaborate on the meaning of the term "to operate" a facility, and this court has

---

1. In determining that Tufts could not be held liable as the owner of the Eppinger plant, the district court applied the well-settled rule that a parent corporation is not the owner of the assets of its subsidiary. Absent a showing sufficient to pierce the corporate veil, the district court de-
clined to impose owner liability on the parent for the acts of its subsidiary. *See Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80 (5th Cir.1990). The appellants do not challenge that analysis or conclusion. *Jacksonville Elec. Auth.,* 776 F.Supp. at 1545–46.

never addressed the issue.[2]

■ Because CERCLA contemplates "operator" liability based only on a person's actions, merely owning the stock of a corporation that disposed of hazardous waste is not sufficient, without more, to hold a shareholder liable as an operator of the corporation's facility. *United States v. Kayser–Roth Corp.*, 910 F.2d 24, 27 (1st Cir.1990) ("[I]t is obviously not the usual case that the parent of a wholly owned subsidiary is an operator of the subsidiary. To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary."), *cert. denied*, 498 U.S. 1804, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). Rather, shareholders are operators for purposes of liability under CERCLA when "they themselves actually participate in the wrongful conduct prohibited by the Act." *Riverside Mkt. Dev. Corp.*, 931 F.2d at 330.

Most courts that have been concerned with the meaning of "operator liability" have held a shareholder responsible only when the shareholder 1) "actually participated in the operations of the facility ... [o]r in the activities which resulted in disposal" or 2) "actually exercised control over, or was otherwise intimately involved in the operations of, the corporation immediately responsible for the operation of the facility." *See Levin Metals, Corp. v. Parr–Richmond Terminal Co.*, 781 F.Supp. 1454, 1456–57 (N.D.Cal.1991) (emphasis in original omitted) (collecting cases).

We find the reasoning of these cases persuasive. CERCLA imposes cleanup liability on "any person who at the time of disposal of any hazardous substance ... *operated* any *facility* at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a) (emphasis added). The plain language of the statute leads to the conclusion that a person is liable as an "operator" when that person actually supervises the activities of the facility. That is, the person must play an active role in the actual management of the enterprise.

■ We agree with the district court that a parent corporation may be held liable as an operator of its subsidiary's business only when it "exercises actual and pervasive control of the subsidiary to the extent of actually involving itself in the daily operations of the subsidiary. Actual involvement in decisions regarding the disposal of hazardous substances is a sufficient, but not a necessary, condition to the imposition of operator liability." *Jacksonville Elec. Auth.*, 776 F.Supp. at 1547–48. To inflict liability based on a showing of anything less would expand the language of the statute beyond the intent of Congress as expressed through the words of the legislation.[3]

■ JEA points to the following activities of Tufts to demonstrate that the university was sufficiently involved in the affairs of the Eppinger plant to make it amenable for cleanup costs as an operator:

(1) Tufts owned all or almost all the stock in Eppinger; (2) Tufts dictated the terms of employment of Eppinger's President (Chadwick) and other executive officers; (3) Tufts' creation of a profit sharing plan for the Eppinger officers; (4) Eppinger's distribution of dividends in excess of net earnings during Tufts' period of ownership, which allegedly contributed to a situation where the equipment at the wood preserving facility was not properly upgraded and replaced; (5) Tufts' receipt of reports at Trustee meetings on the status of Eppinger's operations; (6) Tufts' alleged hiring of William Cook as Director, Vice–President, and General Manager of Eppinger; (7) statements by Trustees to the

---

2. In *Fleet Factors Corp.*, 901 F.2d at 1557–58, a panel of this court seemed to suggest that liability as an operator might require that an entity "actually [ ] involve itself in the day-to-day operations of the facility ... [or] participate in management decisions relating to hazardous waste." However, the court did not go so far as to resolve the issue.

3. JEA argues that we should apply a more "liberal interpretation to reach the [remedial] purposes of the Act." (Init.Br. at 19). *See Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 350 (D.N.J.1991). We decline to do so. Rather, we interpret the terms of the statute according to their ordinary meaning. *See Fleet Factors Corp.*, 901 F.2d at 1555.

---

effect that Tufts carried on a business at the Eppinger facility; (8) during Tufts' period of ownership, the method of wood treatment was changed from the use of arsenic salt to the use of another unspecified chemical.

*Id.* at 1548.

When reviewing the record to evaluate the sufficiency of the evidence of Tufts' operation of the Eppinger facility, we seek more than just indicia of a parent-subsidiary relationship. *See Kayser-Roth Corp.,* 910 F.2d at 27. We look for evidence that would demonstrate that Tufts was actively involved in Eppinger's occupational business affairs, *id.,* or that Tufts itself actually participated in the contamination, *Riverside Mkt. Dev. Corp.,* 931 F.2d at 330. It is particularly important that the record contain such evidence in a case such as this, where the parent company—the trustees of a university—is in an entirely different business than that of the subsidiary. Certain isolated bits of evidence in this record may have greater meaning if attributed to a parent engaged in a similar endeavor such that a greater level of direct involvement and control by the parent could be presumed. Such is not the case here.

The evidence that exists today, more than fifty years after the fact, is not sufficiently probative to satisfy JEA's burden of proving that Tufts actually operated the Eppinger facility. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 (evidence must be significantly probative and more than merely colorable). Even when viewed in the light most favorable to JEA, the evidence before the district court is not enough to satisfy JEA's burden of proving the necessary involvement in Eppinger's affairs to take Tufts beyond its roles of majority shareholder and parent corporation to transform it into an operator liable under CERCLA. *See Jacksonville Elec. Auth.,* 776 F.Supp. at 1548–49.

### IV. CONCLUSION

We have reviewed all the evidence *de novo* and find that it falls short of the involvement necessary to make Tufts liable under CERCLA as the operator of the Eppinger plant. The documentary evidence that chronicles events during this period of stock ownership simply does not demonstrate such a level of activity by Tufts.

The judgment of the district court is AFFIRMED.