**AMERICAN TITLE INSURANCE COMPANY**

v.

**EAST WEST FINANCIAL COR- PORATION and Bay Loan & Investment Bank.**

Civ. A. No. 89–0428–T.

United States District Court, D. Rhode Island.

April 5, 1993.

Max Wistow, Wistow & Barylick, Inc., Providence, RI, John J. O'Connor, III, Bryan, Cave, McPheeters, McRoberts, Washington, DC, for American Title Ins. Co.

Kevin F. McHugh, Louis F. Robbio, Robbio & Nottie, Ltd., Providence, RI, for East West Financial Corp.

James E. Keeley, Howard Walker, Hinckley, Allen, Snyder & Comen, Providence, RI, for Bay Loan & Inv. Bank.

## DECISION AND ORDER

TORRES, District Judge.

This is a declaratory judgment action by American Title Insurance Company ("American Title") in which the relief sought is a declaration that American Title has no obligation under certain mortgagee title insurance policies issued to East West Financial Corporation ("East West") and then assigned to Bay Loan and Investment Bank ("Bay Loan"). East West and Bay Loan have asserted counterclaims for losses that they contend are compensable under the policies and

for punitive damages based upon what is alleged to be American Title's bad faith refusal to honor its contractual obligations.

On April 10, 1991, after a bench trial, Judge Boyle entered judgment denying the requested relief and declaring, instead, that the policies were valid and binding on American Title. The counterclaims by East West and Bay Loan for amounts due under the policies were dismissed without prejudice by Judge Boyle on the ground that they were premature. The remaining counterclaims were dismissed with prejudice. That judgment later was reversed by the Court of Appeals, and the case was remanded for a new trial. After a second bench trial, it is now ready for decision.

## FACTS

During the late 1980's, Peter Brandon, one of the principals in a corporation known as Dean Street Development Company ("Dean Street"), devised a scheme to purchase seven motels along the Rhode Island coastline, convert the rooms into condominium units and sell the units thereby generating what Dean Street anticipated would be handsome profits.[1] As it turned out, Brandon and eleven other participants in that scheme were convicted of defrauding Bay Loan of approximately eighteen million dollars ($18,000,000.00),[2] and their activities led to a wave of civil law suits.

The scheme was a relatively simple one. Dean Street obtained the funds required to purchase the motels from sales of the individual condominium units. When Dean Street had buyers for enough units to generate the amount necessary to purchase a particular motel, closings were conducted with respect to those units, and the proceeds were used to buy the motel.

In order to attract buyers, Dean Street offered them a deal that literally was too good to be true. The principal feature of the deal was that buyers did not have to invest any of their own money. Dean Street helped the buyers obtain mortgage loans without making any downpayments. It also permitted buyers to lease their units back to Dean Street for amounts sufficient to cover their mortgage payments and other expenses associated with the purchases. Buyers were assured that Dean Street would generate the amounts necessary to make lease payments by continuing to operate the motels.

Dean Street arranged financing for the buyers through East West, which acted as a mortgage loan originator, and Bay Loan, which actually advanced the funds. East West processed loan applications and made arrangements for the closings that were conducted by attorney George Marderosian or one of his associates. Marderosian also was Dean Street's attorney and an "authorized agent" for American Title. After the closings, East West forwarded the closing documents to Bay Loan for approval. When Bay Loan had approved the loans, it transmitted the mortgage proceeds to Marderosian for disbursement.[3]

As security for the loans, Bay Loan received mortgages on the individual condominium units. In addition, Marderosian provided mortgagees' title insurance policies issued by American Title. Both the mortgages and the title policies initially were made out to East West and, later, endorsed over to Bay Loan and forwarded to Bay Loan along with the other closing documents. All of that was done before Bay Loan formally approved the loans or disbursed the funds required to discharge prior mortgages on the motels. However, Marderosian assured both East West and Bay Loan that such mortgages would be paid from the loan proceeds transmitted to him. In any event, all of the policies issued by Marderosian were "clean" policies, meaning that the insured mortgages were not subject to any prior encumbrances.

---

1. Only four of the seven motels are the subject of this action: The Charlestown Motor Inn; The Hillside Motel; The Sand Castle Motel; and The Sandpiper Motel.

2. *United States v. Brandon*, CR. Nos. 91–016–01 to –12.

3. In a few instances, checks were issued directly to third parties, including Dean Street, in accordance with Marderosian's instructions.

One reason the deal offered to buyers was too good to be true was that East West and Bay Loan were unaware of the fact that the buyers had not made any downpayments and that they (East West and Bay Loan) were financing the entire purchase price of each unit. In fact, Dean Street used a variety of subterfuges to make it appear that the loans made by East West and Bay Loan represented only part of the purchase price for each unit. Initially, Dean Street falsely stated on the closing documents that downpayments had been made by the buyers. Later, when Bay Loan began requiring cancelled checks as proof that downpayments had been made, Dean Street wired money to the buyers' accounts before the closings so that the buyers could write checks back to Dean Street. On some occasions, the buyers would sign second mortgages to Dean Street that were included in the closing documents but, by prearrangement, were discharged immediately after closing without Bay Loan's knowledge.

The scheme started to unravel when Marderosian began "temporarily" diverting loan proceeds to Dean Street instead of using them to discharge prior mortgages. The inevitable result was that the holders of those mortgages foreclosed thereby extinguishing the subsequent mortgages Bay Loan held on the individual condominium units. As a consequence, Bay Loan lost its security interest in all 24 units at The Sand Castle Motel, 2 of the 39 units at The Sandpiper Motel, and 17 of the 33 units at The Charlestown Motor Inn.[4] In addition, Bay Loan was required to pay off prior mortgages on The Hillside Motel totalling $337,463.13 in order to preserve its security interest in the 37 units at that motel.

After the dust settled, East West and Bay Loan filed claims for approximately $18,000,000.00 under the 146 title policies issued to them. American Title denied those claims and brought this action seeking a declaratory judgment to the effect that it has no obligation under those policies. American Title offered three reasons why such a judgment should be entered:

1. Under the circumstances, Marderosian had neither actual nor apparent authority to issue "clean" policies that did not contain exceptions for prior mortgages;

2. East West and Bay Loan "created, suffered or assumed" the risk of the defects or encumbrances in question, and therefore, their losses are excluded from coverage by the terms of the policies; and

3. The mortgages in question are void and, therefore, uninsurable because the sales from which they arise involve violations of federal securities laws that were aided and abetted by East West and Bay Loan.

## PROCEDURAL HISTORY

### I. *The First Trial*

As already noted, this case previously was tried by Judge Boyle sitting without a jury. Judge Boyle found that, under the terms of the agency agreement between Marderosian and American Title, Marderosian lacked *actual* authority to issue "clean" title policies with respect to properties that were subject to prior mortgages. However, Judge Boyle also found that Marderosian had *apparent* authority to issue the policies because American Title "clothed Marderosian with a general authority to act on its behalf" and failed to meet its "heavy burden in proving that third parties should be charged with knowledge of specific restrictions written into the agency contract." *American Title Ins. Co. v. East West Financial Corp. & Bay Loan Investment Bank*, No. 89-0428, slip op. at 8 (D.R.I. April 10, 1991).

Moreover, Judge Boyle found that East West and Bay Loan disbursed funds to Marderosian with the "justified expectation" that those fund would be used to discharge prior mortgages and that, in failing to pay those mortgages before issuing "clean" policies, Marderosian was not acting as the agent of East West and/or Bay Loan. Consequently, Judge Boyle determined that East West and Bay Loan had not "created, suffered or assumed" the risk of loss attributable to prior encumbrances.

---

4. There are also prior mortgages on the remaining 16 units of The Charlestown Motor Inn.

These units are presently the subject of a quiet title action by Bay Loan.

Finally, Judge Boyle rejected American Title's claim that Bay Loan and East West aided and abetted Dean Street in violating federal and state securities laws. Specifically, he found "no evidence" that Bay Loan knew of any such violations by Dean Street and that it would be "nonsensical" to infer that Bay Loan would knowingly assist activities that placed its mortgages at risk.

Accordingly, Judge Boyle entered judgment denying American Title's claim for declaratory relief and declaring, instead, that the mortgagees' title insurance policies were valid and binding on American Title. Nevertheless, he dismissed, without prejudice, the counterclaims asserted by East West and Bay Loan for amounts allegedly due under the policies on the ground that they were premature. In doing so, Judge Boyle noted that no legal action had been taken against defaulting mortgagors and that *Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058 (1st Cir.1990), made such action a prerequisite to suit under a mortgagee's title insurance policy in order to establish the amount of the mortgagee's loss. Because the claims asserted by East West and Bay Loan were premature, Judge Boyle determined that American Title was justified in refusing to pay them. Consequently, he dismissed, with prejudice, the counterclaims for bad faith refusal to pay. *See Corrente v. Fitchburg Mut. Fire Ins. Co.*, 557 A.2d 859, 861 (R.I.1989). Judge Boyle also dismissed various other counterclaims for negligence and interference with contractual relations for failure to pursue them at trial. All parties filed cross appeals from that judgment.

II. *The Appeal*

The Court of Appeals reversed and remanded the case. Specifically, it held that Judge Boyle "improperly placed the burden of proof on American Title" to establish that "Marderosian did *not* have the *apparent* authority to issue 'clean' title insurance policies when there were prior encumbrances or other liens on the property." *American Title Ins. Co. v. East West Financial Corp.*, 959 F.2d 345, 349 (1st Cir.1992) (emphasis added). The Court stated that "[i]n light of such an error we cannot properly review the dis-

trict court's findings as to the merits of the agency claim." *Id.* Because the question of apparent authority was determined to be "a threshold issue which either opens the door to the other issues or slams it shut," the Court found that it "need not reach the other issues raised by both parties on appeal." *Id.* Nevertheless, the Court did express agreement with Judge Boyle's finding that Marderosian lacked *actual* authority to issue the policies in question. *Id.* at 349 n. 4.

## DISCUSSION

I. *Scope of the Remand and Law of the Case*

The first question confronting this Court is whether it must address all of the issues previously decided by Judge Boyle or only the issue of Marderosian's authority to bind American Title which was the sole issue considered by the Court of Appeals.

■ The general rule is that a trial court is required to adhere to an appellate court's directions for disposition of a case on remand. *See United States v. Bell*, 988 F.2d 247, 251 (1st Cir.1993); 1B J. Moore, J. Lucas, and T. Currier, *Moore's Federal Practice* ¶ 0.416[2] (2d Ed.1991). In this case, the Court of Appeals' opinion states: "We remand this case for a total new trial on the merits *in light of the holding of this opinion.*" *American Title*, 959 F.2d at 349 (emphasis added). The mandate omits the word "total" and provides that "the cause is remanded to the District Court for a new trial on the merits *in accordance with the opinion* issued this date." *American Title*, 959 F.2d 345 (1st Cir.1992) (mandate) (emphasis added). Thus, this Court must read those words in the context of the opinion as a whole.

As already noted, the Court of Appeals stated that Judge Boyle "erred as a matter of law in allocating the burden of proof on whether Marderosian had *apparent* authority to act for American Title." *American Title*, 959 F.2d at 349 (emphasis added). That was the sole ground for reversal. The Court of Appeals expressly refrained from addressing any other issue except to express agreement with Judge Boyle's finding that Marderosian

lacked *actual* authority. *American Title,* 959 F.2d at 349 n. 4. Consequently, it seems clear that, in remanding, the Court of Appeals intended that only the apparent authority issue be relitigated.

That conclusion is reinforced by the absence of any perceptible purpose to be served by relitigating the other issues decided by Judge Boyle. Although, as the Court of Appeals said, resolution of the apparent authority question will either open or close the door to consideration of those issues, such issues are otherwise independent from the issue of apparent authority. To put it another way, the validity of Judge Boyle's findings and determinations with respect to the other issues are distinct from and unaffected by his findings and determinations with respect to Marderosian's apparent authority. Therefore, there is no logical reason to duplicate Judge Boyle's efforts in reaching decisions with which the Court of Appeals has found no fault.

■ On the contrary, relitigating those matters would be inconsistent with the "law of the case" doctrine and the objectives of judicial economy and finality that it serves. Under the "law of the case" doctrine, a decision on an issue of law made at one stage of a case is viewed as a binding precedent that must be followed at later stages of that case. *See* Moore, *supra* at ¶ 0.404[1]. When the decision is one made by a higher court, a lower court has no authority to revisit the issue. *See* Moore, *supra* at ¶ 0.404[1]. When the decision is one made by the same court or a co-ordinate court, the court in which the case is pending has the power to reconsider the decision but should exercise that power only if there are extraordinary circumstances that, otherwise, would cause a serious injustice. *Bell, supra,* at 251; *United States v. Rivera–Martinez,* 931 F.2d 148, 151 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991). *See Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 814–15, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (law of the case doctrine applies with the same force to the decisions of coordinate court as it does to a court's own decisions).

■ Generally speaking, when a higher court reverses one ground and remands a case without disturbing other determinations made by a lower court, the determinations not reversed continue to be the "law of the case." *See* Moore, *supra* at ¶ 0.416[2]. That is particularly true when the other determinations were not the subject of the appeal. In such cases, the First Circuit has held that, on remand, the lower court must confine itself to matters within the specified scope of the remand and *cannot* reconsider issues it previously decided absent extraordinary circumstances. *Bell, supra* at 251; *see also Kotler v. American Tobacco Co.,* 981 F.2d 7, 13 (1st Cir.1992); *Rivera–Martinez,* 931 F.2d at 150–51.

■ In this case, the only ground for reversal was what the Court of Appeals said was error in allocating the burden of proof with respect to Marderosian's apparent authority. Therefore, Judge Boyle's decisions with respect to all other issues continues to be the "law of the case" unless there are extraordinary circumstances requiring that they be reconsidered in order to avoid serious injustice. Such extraordinary circumstances may be manifested in any one of three forms:

1. A dramatic change in controlling legal authority; or

2. A proffer by the party seeking to overturn the prior decision of significant new evidence not earlier obtainable in the exercise of due diligence; or

3. A blatant error infecting the prior decision that, if uncorrected, will result in serious injustice.

*Bell,* at 251.

■ In this case, there has been no intervening change in controlling legal authority other than the Court of Appeals' holding with respect to Marderosian's apparent authority. In addition, with one very limited exception relating to the prematurity of Bay Loan's claim for damages under the title policy issued with respect to the condominium unit purchased by Norma Kirschner,[5] no new evidence has been proffered that would alter

5. *See, infra.* at 260.

Judge Boyle's findings. Finally, there is no indication of any error by Judge Boyle or any injustice that would be caused by accepting his findings. Thus, this Court concludes that Judge Boyle's decision with respect to all legal issues except those relating to Marderosian's apparent authority and the counterclaim for damages under the Kirschner policy are the "law of the case." Accordingly, the Court turns its attention to the apparent authority issue.

II. *Apparent Authority*

■■■ An agent is cloaked with apparent authority when the principal acts in a way that causes a third party to reasonably believe that the agent is authorized to act on the principal's behalf. *See Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Systems, Inc.,* 539 A.2d 523, 526 (R.I. 1988); *Calenda v. Allstate Ins. Co.,* 518 A.2d 624, 628 (R.I.1986); Restatement (Second) of Agency § 8 (1958) (hereinafter "Restatement"). Apparent authority may be created by any manifestation by the principal that he has authorized or consents to the agent's conduct. Such manifestations may be verbal, written or implicit in the principal's conduct. Restatement § 8, at cmt. b. Thus, a principal's appointment of an agent to a position endows the agent with apparent authority to perform the duties normally associated with that position at least when the third person dealing with the agent knows of the appointment. *Id. See also Menard,* 539 A.2d at 526 (principal's bestowal on agent of authority to execute subcontract gave agent apparent authority to modify the subcontract). Apparent authority differs from actual and implied authority in that apparent authority is created by the principal's manifestations to third parties whereas actual and implied authority are created by the principal's dealings with the agent. Restatement § 27, at cmt. a.

A. Burden of Proof

■■■ In most cases, the issue of apparent authority is raised when a third party sues the principal contending that the principal is responsible for acts committed by the agent. The third party, as plaintiff, is required to prove all elements of its claim against the principal including that the agent had apparent authority to act on the principal's behalf. As a result, the rubric that a *third party* who seeks to *charge* a principal for the acts of an agent has the burden of proving the agent's authority is one that has become deeply embedded in black letter law. *Inleasing Corp. v. Jessup,* 475 A.2d 989, 995 (R.I.1984); *H.W. Ellis, Inc. v. Alofsin,* 87 R.I. 252, 140 A.2d 131, 131–132 (1958); *Goodman v. Zitserman,* 47 R.I. 466, 134 A. 4, 5 (1926).

■■■ This case, though, does not fit neatly into that mold. It began as a suit by the principal (i.e., American Title) against the third parties (i.e., East West and Bay Loan) in which the *principal* sought a declaration that its agent *lacked* apparent authority. Insofar as that claim is concerned, it appears that American Title, as plaintiff, should have the burden of proving such lack of authority. Otherwise, East West and Bay Loan, as defendants, in effect, would be required to *disprove* the assertion that Marderosian lacked apparent authority thereby relieving American Title of any obligation to prove anything in order to prevail on its claim. On the other hand, East West and Bay Loan have asserted counterclaims that are predicated on the contention that Marderosian *did* have apparent authority to issue "clean" title policies on American Title's behalf. With respect to those counterclaims, the burden clearly is on East West and Bay Loan to prove apparent authority.

In any event, the Court of Appeals' opinion does not make any such distinctions regarding allocation of the burden of proof. It simply states that the burden is on East West and Bay Loan to prove Marderosian's apparent authority and not on American Title to disprove it. Therefore, for purposes of this case, that is the rule that this Court must apply.

B. Marderosian's Apparent Authority

■■■ As East West and Bay Loan point out, Marderosian was one of American Title's approved attorneys, and as such, he was authorized to issue title policies on American Title's behalf. It is true, as Judge Boyle found, that under the terms of the written agency agreement between Marderosian and

American Title and the manual provided to policy writing attorneys, Marderosian did not have *actual* authority to issue "clean" policies under these circumstances.[6] The agency agreement required approved attorneys to except from coverage all prior liens against property that was the subject of a title policy. Furthermore, the manual prohibited "insuring around" unpaid liens unless the funds required to pay them were in the approved attorney's possession and the lien holder was an institution. However, the evidence shows that East West and Bay Loan were unaware of any such limitations on Marderosian's authority. Consequently, in the absence of any reason to believe otherwise, they were entitled to expect that, because American Title had placed Marderosian in a position of trust, he would act in accordance with the authority vested in him by his principal. *See, e.g., Menard,* 539 A.2d at 526; Restatement § 27, at cmt. a.

Here, there was no reason for East West or Bay Loan to believe that there was anything improper about issuing the policies before prior mortgages were discharged. It was common practice among title attorneys to use the proceeds of purchase money mortgages to discharge prior mortgages after closing. Although it was less common for an attorney to issue a title policy before prior mortgages were discharged, that practice was acceptable when the attorney had adequate assurances that the funds required to pay such mortgages would be forthcoming and that the mortgagees would, in fact, execute discharges.

In this case, East West and Bay Loan had no cause to be concerned about the availability of funds necessary to pay prior mortgages because Bay Loan itself was the source of those funds. Furthermore, unless the funds were advanced, Bay Loan would not have been at risk because it would have had no mortgages. Finally, East West and Bay Loan had no reason to doubt Marderosian's

assurances that the proceeds of their loans would be used to discharge the prior mortgages. Indeed, it would be unreasonable to conclude that they would have made such loans if they suspected otherwise.

In short, under the circumstances, it was perfectly reasonable for East West and Bay Loan to believe that Marderosian was authorized to issue "clean" title policies. Consequently, the Court finds that Marderosian acted within the scope of his apparent authority and the policies in question are binding on American Title in accordance with their terms.

### III. *Damages*

As already noted, Judge Boyle dismissed the counterclaims asserted by East West and Bay Loan for amounts allegedly due under their title policies on the ground that those counterclaims were premature. He based his ruling on *Falmouth Nat'l Bank v. Ticor Title Ins. Co., supra,* where it was held that mortgagees' title policies indemnify only for the actual losses sustained and that such losses cannot be determined until the "insured sues on the notes and the debtor fails to pay" and on the fact that the *Falmouth* court affirmed a dismissal, without prejudice, of a claim brought prior to that time. *Falmouth,* 920 F.2d at 1063.

One of the practical difficulties in applying *Falmouth* is determining how far the insured must go in prosecuting such a suit, or, to put it another way, determining the point at which it can be said that the debtor has failed to pay.[7] At the time Judge Boyle rendered his decision, that determination was a relatively easy one. Bay Loan had not initiated suit against any of its defaulting borrowers. Therefore, all of its title insurance claims were premature. However, since then, matters have become considerably more complicated. Bay Loan has now sued most of the delinquent borrowers. In five of those cases, Bay Loan has obtained

---

6. As already noted, the Court of Appeals expressed its approval of Judge Boyle's finding on this point. *American Title,* 959 F.2d at 349, n. 4. Moreover, even if such approval is not viewed as part of the Court of Appeals' holding, Judge Boyle's finding would continue to be the "law of the case" because it was not disturbed on appeal.

7. Another difficulty is determining how long the mortgagee should have to prosecute the suit and/or how many times a premature suit may be brought against the insurer and dismissed *without* prejudice.

default judgments but executions have not yet been returned. In the remaining cases, answers have been filed by the mortgagors denying liability and, in some cases, asserting counterclaims against Bay Loan. Furthermore, several borrowers have filed bankruptcy petitions. In those cases, Bay Loan has either filed claims or objected to the discharge of its mortgage loans.

American Title, on the one hand, and East West and Bay Loan, on the other hand, have altered their respective positions several times as to whether any of Bay Loan's efforts satisfy the requirements of *Falmouth*. Like legal chameleons, they have adapted their positions to blend with the changing tactical landscape. Initially, American Title argued that Bay Loan's claims were premature and Bay Loan insisted that it had complied with the requirements of *Falmouth*. However, when it appeared that Bay Loan was unable to prove an essential element of its damages (i.e., the amount by which the title defects impaired the value of its security), both parties reversed their positions.

■ In the Court's view, the only reasonable reading of *Falmouth* is that a mortgagee must pursue legal action against a defaulting borrower until a reasonable lender would write the debt off as uncollectible or, to put it another way, until the anticipated cost of further proceedings against the borrower would be greater than any amount that is likely to be recovered. *See Focus Inv. Assoc., Inc. v. American Title Ins. Co.,* 797 F.Supp. 109, 116 (D.R.I.1992). In this case, that point has not yet been reached with respect to any of the borrowers against whom claims are still pending. At the present time, there is no way to determine what amounts Bay Loan might receive from the estates of bankrupt borrowers or how much might be realized from the executions issued pursuant to its default judgments. It is even more difficult to predict what amounts, if any, might be obtained in connection with those suits that are contested. Consequently, it is impossible to ascertain the amounts of Bay Loan's losses with respect to those loans and any title insurance claims based on those loans remain premature.

■ The loan to Norma Kirschner, the purchaser of one of the units at The Charlestown Motel, presents a much different situation because it involves significant developments that occurred after Judge Boyle's decision. With the consent of American Title, Bay Loan settled its claim against Ms. Kirschner for $15,000.00. Thus, the amount that Bay Loan is unable to collect from Ms. Kirschner is readily ascertainable. It is the difference between the outstanding loan balance and the settlement payment. Accordingly, Bay Loan's claim under the title policy issued with respect to the Kirschner unit is ripe. However, unfortunately for Bay Loan, it has failed to prove its damages.

The policy insures Bay Loan "against loss or damage ... sustained or incurred by the insured by reason of ... [t]he invalidity or unenforceability of the lien of the insured mortgage ... [or t]he priority of any lien or encumbrance over the lien of the insured mortgage." The policy further provides that American Title's liability is limited to the lesser of:

1. Bay Loan's actual loss;

2. The amount of insurance, or;

3. The indebtedness secured by the insured mortgage at the time of the loss. American Title Insurance Policy No. 61–066243, Conditions and Stipulations, ¶ 6.

With respect to the Kirschner loan, both the amount of insurance and amount of the indebtedness secured by the insured mortgage are known. What is not known is how much Bay Loan actually lost by reason of title defects.

■ Proof of the amount that is uncollectible from a defaulting borrower is only the first step in establishing a mortgagee's actual loss under a title policy. The mortgagee also must demonstrate that the security for its mortgage is inadequate to satisfy the deficiency. *See Falmouth*, 920 F.2d at 1063. In addition, the mortgagee must establish the extent to which the "shortfall" is attributable to title defects covered by the policy. In other words, the mortgagee must prove how much of the loss would have been avoided if title had been as stated in the policy.

■ To put it another way, the title company does not insure the *amount* of the insured's mortgage or the *value* of the insured's collateral. What it insures is that title to the property is as described in the policy and that the mortgage constitutes a valid lien. Therefore, the measure of the title company's liability cannot exceed the amount by which the title defects diminished the value of the insured mortgage. Proof of that amount requires evidence of the difference between the value the mortgage would have had absent the defects and the value of the mortgage subject to those defects. For example, a lender that makes a $75,000.00 loan and receives, as security, a mortgage on property worth $50,000.00 cannot recover the entire $75,000.00 under its mortgagee's title policy if the title defects render its mortgage worthless. It's recovery would be limited to $50,000.00, the amount it lost "by reason of" the title defects.

■ Here, it is clear that the security for Bay Loan's mortgage was inadequate to satisfy the deficiency on the Kirschner loan. Bay Loan's mortgage was rendered worthless when the first mortgagee foreclosed. However, Bay Loan has failed to prove the value of the Kirschner condominium which is the value its mortgage would have had "but for" the title defects. To put it another way, Bay Loan has failed to prove how much of its "loss" was sustained "by reason" of title defects covered by the policy.

Bay Loan did proffer evidence regarding the value of The Charlestown Motor Inn as an operating motel on the theory that the value of each individual unit is a proportionate share of that amount. However, that approach ignores the fact that what American Title insured was title to and the validity of Bay Loan's mortgage liens on individual condominium units. It did not insure the motels as going businesses or the value of individual units calculated as a percentage of the motel's value. Those two values may differ just as the total value of ten residential lots comprising a city block may be considerably different from the value of those lots when combined to form one parcel of commercial real estate.

Bay Loan has been afforded every opportunity to prove the amount by which the value of its security in the Kirschner unit was diminished by title defects. Since it has failed to do so, its counterclaim for damages under the Kirschner policy is dismissed with prejudice.

IV. *Alternative Findings*

As already stated, it is this Court's opinion that Judge Boyle's findings with respect to the alleged securities law violations and with respect to American Title's contention that East West and Bay Loan "created, suffered or assumed" the risk of the title defects in question constitute the "law of the case." Nevertheless, because there is no way of knowing whether the Court of Appeals might take a different view and because evidence was received bearing on those issues, this Court will make alternative findings regarding those matters.

A. Aiding and Abetting Securities Law Violations

American Title asserts that the mortgages held by East West and Bay Loan are void or, alternatively, that East West and Bay Loan are estopped from making claims under those mortgages because they aided and abetted Dean Street in selling the condominium units in violation of applicable securities laws. Specifically, American Title contends that the condominiums were "securities" and that:

1. Sale of the condominiums without registering them was a violation of § 5(a) of the Securities Act of 1933 (15 U.S.C. § 77e(a) (1991));

2. The documents supplied to the purchasers contained material misrepresentations and omissions with respect to material facts (e.g., the appraised values of the units, projections regarding future operating income and the financial ability of those guaranteeing the leasebacks to honor their guarantees) in violation of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j (1983)), Securities Exchange Commission Rule 10b-5, and 15 U.S.C. § 77q (1991);

3. Dean Street, as a broker arranging the loans, violated the credit restrictions imposed upon brokers by 15 U.S.C. § 78g (1992).

In order to establish that a defendant aided and abetted a violation of the laws prohibiting securities fraud, a plaintiff must prove:

(1) the commission of a violation of § 10(b) or rule 10b–5 by the primary party;

(2) the defendant's general awareness that his role was part of an overall activity that is improper; and

(3) knowing and substantial assistance of the primary violation by the defendant.

*Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir.1983).

■ In this case, American Title has failed to prove that East West and/or Bay Loan were aware of any securities law violations or that they knowingly assisted in those violations. With respect to the alleged registration requirement, there was evidence that Gary Garabedian, East West's President, had once seen a document referring to the condominiums as securities and that Joseph Gormley, Bay Loan's Vice President of Consumer Loans, had been told that the condominiums were securities. However, Garabedian did not believe that an interest in real estate could be classified as a security, and Gormley was advised by Marderosian that sale of the condominiums fell within one of the exemptions to the securities laws' registration requirements.

Nor is there any evidence that East West and Bay Loan were aware of any misrepresentations by Dean Street regarding the financial risks associated with the purchases. American Title contends that such knowledge may be inferred from the manifestly imprudent practices followed by East West and Bay Loan in approving loans which, in some cases, violated their own procedures. It is true that, under some circumstances, the fact that a party engaged in irregular or atypical practices in connection with financial transactions may warrant an inference that the party had knowledge that the transactions were illegal. *See Woods v. Barnett Bank,* 765 F.2d 1004, 1012 (11th Cir.1985). However, in this case, it would be patently unreasonable to draw such an inference. As Judge Boyle

found, Bay Loan's expectation of repayment depended, largely, on the success of the motels. Therefore, it is highly unlikely that Bay Loan would have advanced funds if it knew that its mortgages would be subject to attack under the securities laws or that Dean Street valuations and financial projections were grossly overstated.

In short, American Title has failed to prove the scienter element required to support its claim for aiding and abetting securities law violations.

B. Creation, Sufferance or Assumption of Risk

The title policies in question exclude from coverage any defects "created, suffered, assumed or agreed to by the insured." American Title contends that the losses for which Bay Loan seeks to recover are attributable to Bay Loan's own imprudent lending practices. Alternatively, it argues that Bay Loan is responsible for such losses because, in failing to discharge prior mortgages, Marderosian acted as Bay Loan's agent. This Court does not find either argument persuasive for reasons very similar to those already mentioned.

■ The exception relied upon by American Title excludes from coverage "defects, liens [and] encumbrances ... created, suffered, assumed or agreed to by the insured." Insurance Policy, *supra,* at 2, Exclusions From Coverage, ¶ 3. The defects, liens and encumbrances referred to are defects *in title* that impair the validity or priority of the lien represented by the insured mortgage. The policy does not insure the loan itself. Therefore, the fact that the loans may have been ill advised does not relieve American Title from responsibility for such defects. What Bay Loan paid for and what it had a right to expect was that title to the condominiums was as described in the policies and that its mortgages were valid and enforceable first mortgages.

■ The agency argument requires little discussion. In order to escape liability on the ground that a title defect was created, suffered or assumed by an insured, an insurer must demonstrate "that the defect, lien or

encumbrance resulted from some intentional misconduct or inequitable dealings by the insured." *First Nat'l Bank of Minneapolis v. Fidelity Nat'l Title Ins. Co.*, 572 F.2d 155, 161 (8th Cir.1978); *Brown v. St. Paul Title Ins. Corp.*, 634 F.2d 1103, 1107 n. 8 (8th Cir.1980). Here, no such showing has been made. As already noted, Marderosian had apparent authority to issue "clean" title policies on behalf of American Title. In doing so, he acted as American Title's agent, not Bay Loan's agent. Moreover, East West and Bay Loan justifiably relied on Marderosian's representations that he would use the loan proceeds to discharge prior mortgages and were unaware that he did otherwise. Therefore, the defects in title against which the policies insure were neither created, suffered nor assumed by East West or Bay Loan.

## CONCLUSION

For all of the foregoing reasons, the clerk is hereby directed to enter judgment as follows:

1. American Title's claim for declaratory and injunctive relief is denied and dismissed with prejudice.

2. The counterclaims by East West and Bay Loan for damages under the title policy issued with respect to Unit #4 at The Charlestown Motor Inn purchased by Norma Kirschner is denied and dismissed with prejudice.

3. The counterclaims by East West and/or Bay Loan for compensatory damages under the remaining title policies are dismissed *without* prejudice.

4. The remaining counterclaims by East West and/or Bay Loan are denied and dismissed with prejudice.

IT IS SO ORDERED.