### UNITED STATES

v.

### KAYSER–ROTH CORP., INC.

C.A. Nos. 98–160T, 88–325B.

United States District Court,
D. Rhode Island.

June 22, 2000.

Terrence P. Donnelly, U.S. Attorney's Office, Providence, RI, Donald G. Frankel, U.S. Dept. of Justice, Environmental Enforcement Section, Newton Corner, MA, for Plaintiff.

William S. Eggeling, Ropes & Gray, Providence, RI, J. Daniel Berry, Ropes & Gray, Washington, DC, for Defendant.

### *MEMORANDUM AND ORDER*

TORRES, Chief Judge.

Background ...................................................... 77
    The 1988 Case ................................................ 77
    The Appeal .................................................. 78
    The 1998 Case and Bestfoods ................................. 78
The Rule 60(b) Standard ......................................... 78
Discussion ...................................................... 79
    I.  *Prospective Application* .................................. 79
   II.  *Inequity* ................................................. 80
 III.  *Futility* ................................................. 81
      A.  *Operator Liability* ................................... 81
      B.  *Owner Liability* ...................................... 82
          1.  *Law of the Case* ................................. 82
          2.  *Bestfoods* ...................................... 84
Conclusion ...................................................... 85

Kayser–Roth Corp., Inc. ("Kayser–Roth" or "KR") has moved, pursuant to Fed.R.Civ.P. 60(b)(5), for relief from that portion of a 1990 judgment (the "declaratory judgment") entered by Judge Boyle [1] in C.A. No. 88–325–B (the "1988 case") declaring KR liable for the future cost of remediating a hazardous waste site in For-

---

**1.** Judge Boyle has since taken senior inactive status.

estdale, R.I. (the "Site"). That motion was prompted by the commencement of another action (C.A. 98–160T or the "1998 case") in which the United States seeks to recover some of those costs.

The issues presented are whether the declaratory judgment has "prospective application" within the meaning of Rule 60(b)(5); and, if so, whether Kayser–Roth is entitled to relief from that judgment on the ground that the Supreme Court's intervening decision in *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) represents a material change in the law governing a parent corporation's liability under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675 ("CERCLA") as the "operator" or "owner" of a hazardous waste facility.

I find that although, in this case, the United States seeks to apply the declaratory judgment prospectively, relief may not be obtained under Rule 60(b)(5) because *Bestfoods* does not render continued application of that judgment inequitable. Accordingly, Kayser–Roth's motion for relief from judgment is denied.

### Background

*The 1988 Case*

In 1990, Judge Boyle entered judgment against Kayser–Roth in C.A. No. 88–325–B requiring Kayser–Roth to pay some of the costs previously incurred by the United States Environmental Protection Agency ("EPA") in remediating the Site. The judgment also declared Kayser–Roth liable under CERCLA for any future remediation costs incurred by EPA. *See United States v. Kayser–Roth Corp.,* 724 F.Supp. 15, 16–19 (D.R.I.1989). The facts underlying the declaratory judgment are recited in Judge Boyle's written opinion, *see generally id.,* and may be summarized briefly as follows.

From 1952 to 1975, Stamina Mills Inc., a wholly-owned subsidiary of Kayser–Roth, operated a textile mill in Forestdale. In 1969, Stamina Mills installed a system that used trichloroethylene ("TCE") to clean its equipment. A few months later, a tanker truck that was delivering TCE accidentally spilled an indeterminate quantity of the chemical at the site. Apparently, additional quantities of TCE also leached into the soil from empty TCE containers that were discarded in a landfill on Stamina Mills's property.

Several years later, studies by EPA and the Rhode Island Department of Health determined that TCE from the site had contaminated nearby wells. Consequently, the site was added to the Superfund list, and cleanup efforts began. Stamina Mills then ceased doing business, and EPA brought a CERCLA action against Kayser–Roth seeking reimbursement for the costs it had incurred and for a declaration that Kayser–Roth would be liable for any additional costs incurred in the future.

Although EPA presented six theories on which it claimed that Kayser–Roth was liable, Judge Boyle found it necessary to address only two of them. He determined that Kayser–Roth was an "operator" of the site within the meaning of 42 U.S.C. § 9601(20) because it exercised "pervasive control over Stamina Mills," including control "with regard to environmental matters." *Kayser–Roth,* 724 F.Supp. at 22. More specifically, Judge Boyle found that:

> Kayser–Roth had the power to control the release or threat of TCE, had the power to direct the mechanisms causing the release, and had the ultimate ability to prevent and abate damage. Kayser–Roth knew that Stamina Mills employed a scouring system that used TCE; indeed, Kayser–Roth approved the installation of that system after mandating that a cost-benefit study be made by Stamina Mills.

*Id.*

Judge Boyle also determined that Kayser–Roth was an "owner" of the site within the meaning of § 9601(20) because, in effect, Stamina Mills was merely Kayser–Roth's alter ego. More specifically, Judge Boyle found that Stamina Mills's corporate

veil should be pierced "not only because public convenience, fairness, and equity dictate such a result, but also due to the all encompassing control which Kayser–Roth had over Stamina Mills as, in fact and deed, an owner." *Id.* at 24.

Accordingly, judgment was entered against Kayser–Roth for $846,492.33 in response costs previously incurred by EPA, plus interest of $111,928. In addition, a declaratory judgment was entered stating that "defendant Kayser–Roth Corporation is liable to the United States, pursuant to 42 U.S.C. § 9607(a)(2), for all further response costs incurred by the United States related to the Stamina Mills Site."

*The Appeal*

Kayser–Roth appealed from the 1990 judgment, but the appeal was unsuccessful. *See United States v. Kayser–Roth Corp.*, 910 F.2d 24 (1st Cir.1990). In affirming the District Court's judgment, the First Circuit stated:

> Without deciding the exact standard necessary for a parent to be an operator, we note that it is obviously not the usual case that the parent of a wholly owned subsidiary is an operator of the subsidiary. To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary.

*Id.* at 27.

The Court went on to find that the degree of control described in the "district court's excellent opinion," *id.*, was "more than sufficient" to impose "operator" liability on Kayser–Roth. *Id.* at 28. Since the imposition of operator liability was dispositive, the Court of Appeals did not reach the "veil-piercing" issue.

*The 1998 Case and Bestfoods*

In March of 1998, EPA commenced C.A. 98–160T to recover additional response costs of $4.1 million incurred after the period covered by the 1990 judgment, plus $2.3 million in interest.

■ Three months later, the Supreme Court issued its decision in *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) in which it held, *inter alia*, that the test for determining whether a parent corporation may be held *directly* liable as the *operator* of a hazardous waste facility run by its subsidiary "is not whether the parent operates the subsidiary, but rather whether it operates the facility." 524 U.S. at 67, 118 S.Ct. 1876. That decision prompted Kayser–Roth to file its Rule 60(b)(5) motion for relief from the 1990 judgment. Kayser–Roth argues that imposing "operator" liability on it is inconsistent with *Bestfoods* because both Judge Boyle and the First Circuit focused on whether Kayser–Roth controlled Stamina Mills rather than on whether Kayser–Roth controlled operations at the site. Kayser–Roth also argues that *Bestfoods* rejected the standard utilized by Judge Boyle in piercing Stamina Mills's corporate veil and holding Kayser–Roth derivatively liable as an "owner" of the facility.

### The Rule 60(b) Standard

■ Rule 60(b) represents an effort to strike a balance between two competing and equally important objectives of our legal system. It seeks to reconcile the strong public policy interest in recognizing the finality of judgments with the equally strong policy interest in attempting to ensure that disputes are decided on their merits and that justice is done. *See Cotto v. United States*, 993 F.2d 274, 276 (1st Cir.1993); *Teamsters, Chauffeurs, Warehousemen & Helpers' Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 19 (1st Cir.1992). In attempting to strike that balance, courts, generally, are "disinclined to disturb judgments under the aegis of Rule 60(b)" unless the party seeking relief can demonstrate: (1) that its motion was timely filed; (2) the existence of exceptional circumstances justifying extraordinary relief; (3) the absence of unfair prejudice to the opposing party; and (4)

that there is reason to believe that vacating the judgment will not be an empty exercise. *See Teamsters, Chauffeurs, Warehousemen & Helpers Union,* 953 F.2d at 19.

### Discussion

In this case, Kayser–Roth relies on that portion of Rule 60(b) that provides for relief from a final judgment when "it is no longer equitable that the judgment should have prospective application." Fed. R.Civ.P. 60(b)(5). More specifically, Kayser–Roth argues that it would be inequitable to continue to apply what it describes as the "discredited" declaratory judgment.[2]

EPA argues that:

(1) the 1990 judgment does not have any "prospective application;" but, rather, it is, in essence, a money judgment in which only the amount of damages remains unliquidated;

(2) requiring Kayser–Roth to pay the additional response costs will not "result in a hardship to Kayser–Roth ... of sufficient magnitude to overcome the overriding interest in the finality of judgments;" and

(3) in any event, vacating the declaratory judgment would be an empty exercise because *Bestfoods* does not and would not alter the result.

### I. Prospective Application

■ A judgment has "prospective application" within the meaning of Rule 60(b)(5) when it "is 'executory' or involves 'the supervision of changing conduct or conditions.'" *Twelve John Does v. District of Columbia,* 841 F.2d 1133, 1139 (D.C.Cir.1988)(citing *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856)). The terms "prospective" and "executory" con-

note something that will not take full effect or become fully operative until sometime in the future. *See* Black's Law Dictionary 592, 1238 (7th ed.1999). A judgment may be deemed to have "prospective application" or to be "executory" if it does not fix all of the rights and liabilities of the parties and leaves some of those rights and liabilities to be determined on the basis of future events. Thus, a declaratory judgment establishing liability but deferring the question of damages until a later time is prospective within the meaning of Rule 60(b)(5), at least with respect to the issue of damages.

■ Here, although the 1990 judgment declared Kayser–Roth liable for future response costs, it did not identify which costs would qualify as response costs under CERCLA or what amounts would be recoverable. Those matters necessarily were left to be determined on the basis of future events. Therefore, in claiming damages determined after entry of the 1990 declaratory judgment, EPA is seeking to apply that judgment prospectively.

Accepting EPA's argument that a judgment has "prospective application" only when it requires a party to "take or refrain from taking, any action in the future," (EPA's Supp. Mem. at 7), would effectively nullify Rule 60(b)(5). It is difficult to imagine any judgment, with the possible exception of one granting injunctive relief, that would fit within EPA's definition. That definition would preclude relief from the application of declaratory judgments to future events, and would render Rule 60(b)(5) meaningless.

The cases relied upon by EPA are clearly distinguishable from this case. In each of those cases, the judgment in question fully and finally adjudicated the rights and obligations of all of the parties and relief was sought not from any prospective application of the judgment itself but rather

---

**2.** Kayser–Roth does not seek to recover any amounts previously paid to EPA pursuant to the 1990 judgment. It seeks relief only from

the declaratory judgment that imposes liability for future response costs.

from its collateral consequences. *See, e.g., DeWeerth v. Baldinger*, 38 F.3d 1266 (2d Cir.1994) (judgment barring claim of ownership of painting on statute of limitations grounds does not have prospective application merely because it precludes future litigation of claim); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.*, 131 F.3d 625 (7th Cir.1997) (declaratory judgment that potentially responsible party under CERCLA was not covered by insurance policy does not have prospective application merely because, as a result of that judgment, the insured is later required to defend itself in a CERCLA action).

EPA's reliance on the provision in CERCLA that makes a declaratory judgment with respect to liability binding in a subsequent action to recover further response costs (42 U.S.C. § 9613(g)(2)) also is misplaced. That section was designed to permit successive actions to recover response costs that, otherwise, might be barred by the doctrine of *res judicata* and the prohibition against splitting a cause of action. *See, Thomas v. F.A.G. Bearings Corp.*, 50 F.3d 502, 506 n. 10 (8th Cir.1995). The statute does not sanction prospective application of a discredited judgment.

In short, to the extent that the 1990 declaratory judgment provides the basis for determining liability for the post-judgment expenses that are the subject of C.A. 98–160T, it would have "prospective application" within the meaning of Rule 60(b)(5).

## II.   Inequity

■   Because of the strong policy interest in preserving the finality of judgments, a change in the law, by itself, does not justify granting relief under Rule 60(b). *See United States v. Woods*, 986 F.2d 669, 674 (3rd Cir.1993). New judicial decisions are not applied retroactively "without substantial justification." *Id.*

■   The burden is on the party seeking relief under Rule 60(b) to show compelling equitable factors that overcome the "over-riding interest in the finality and repose of judgments." *Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3rd Cir.1977). This "requires not only that circumstances have changed, but that unexpected hardship and inequity have resulted." *W.L. Gore & Assoc. v. C.R. Bard, Inc.*, 977 F.2d 558, 561 (Fed.Cir.1992). The requirement is especially strong in CERCLA cases where Congress has expressly provided that declaratory judgments with respect to liability for response costs "will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). While this provision does not preclude relief in appropriate cases, it underscores the need to present a compelling reason for disregarding the judgment.

EPA's argument that requiring Kayser–Roth to pay the additional response costs at issue would not impose a hardship great enough to render it inequitable warrants little discussion. As already noted, those costs exceed $4 million, and EPA seeks an additional $2.3 million in interest. Moreover, it is likely that more will be sought as the remediation work progresses. Although Kayser–Roth may be a company with considerable resources, this Court does not accept EPA's rather cavalier assertion that payment of those sums would not result in a hardship of sufficient magnitude to trigger Rule 60(b)(5).

Nor is this Court persuaded by EPA's argument that any hardship imposed on Kayser–Roth is outweighed by the possibility that granting relief might set a precedent that "could unravel two decades of litigation and consent decree negotiations" upon which clean-up operations in progress at numerous Superfund sites are based. (EPA Mem. at 25–26.) Since Kayser–Roth seeks relief only from *prospective* application of the 1990 judgment, granting that relief would not undo anything that already has been done.

EPA suggests that, even a strictly prospective application of the 1990 judgment would deprive EPA of any further benefit

of that judgment and that such deprivation, also, would outweigh any hardship suffered by Kayser–Roth. However, if the 1990 judgment is inconsistent with *Bestfoods*, accepting EPA's argument would be tantamount to adopting a "two wrongs make a right" policy. It also would be imputing to Congress an intention to carve out an exception from Rule 60(b)(5) applicable only to discredited CERCLA judgments. This Court declines to do either.

### III. Futility

A party seeking relief under Rule 60(b)(5) must provide "reason to believe that vacating the judgment will not be an empty exercise." *Teamsters, Chauffeurs, Warehousemen & Helpers Union*, 953 F.2d at 20. Accordingly, Kayser–Roth must establish both that *Bestfoods* changed the law regarding a parent corporation's liability under CERCLA and that, because of that change, it should be relieved from any further liability.

In determining whether the required showing has been made, it is important to distinguish between "operator" liability and "owner" liability because the 1990 judgment rests on findings that Kayser–Roth was both an owner and an operator.

### A. Operator Liability

■ Kayser–Roth contends that *Bestfoods* rejected the test employed by both Judge Boyle and the First Circuit in holding it liable as an operator of the facility. It argues that Judge Boyle and the First Circuit focused on Kayser–Roth's relationship with and control over Stamina Mills rather than on whether Kayser–Roth controlled operations at the facility.

Under *Bestfoods*, a parent corporation's *direct* liability as an "operator" of a facility maintained by its subsidiary turns on whether the parent "actively participated in, and exercised control over[ ] the operations of the *facility itself*," *Bestfoods*, 524 U.S. at 55, 118 S.Ct. 1876 (emphasis added) and the parent's participation in and control over "the operations of [the] sub-

sidiary," without more, are insufficient to impose operator liability. *Id.*

It is true that in finding operator liability, both Judge Boyle and the First Circuit cited Kayser–Roth's "pervasive control over Stamina Mills." *See Kayser–Roth*, 910 F.2d at 27 (quoting *Kayser–Roth*, 724 F.Supp. at 22). However, Judge Boyle found that such general control encompassed specific control over environmental matters including the operation of the hazardous waste facility. More specifically, Judge Boyle found that:

> Kayser–Roth essentially was in charge in practically all of Stamina's operational decisions, including those involving environmental concerns. Kayser–Roth made the ultimate decision to acquire the dry cleaning process using TCE. Moreover, Kayser–Roth issued a directive requiring Stamina Mills to notify the Kayser–Roth Legal Department of any correspondence with courts or governmental agencies regarding environmental matters. The only autonomy given the officers of Stamina Mills was that absolutely necessary to operate the facility on-site from day to day such as hiring and firing hourly employees and ordering inventory. Stamina was in fact and effect the serf of Kayser–Roth.

*Kayser–Roth*, 724 F.Supp. at 19.

Judge Boyle also found that "Kayser–Roth not only had the capacity to determine the use of TCE but also was able to direct Stamina Mills on how the TCE should have been handled," *id.* at 22–23, and that "when Stamina Mills was sued in 1974 by the United States for an illegal waste water discharge into the Branch River, the final decision on settlement was made by Kayser–Roth's directors." *Id.* Accordingly, Judge Boyle concluded: "[a]lthough not singularly determinative on the issue of operator liability, these factors along with Kayser–Roth's other acts of pervasive control over Stamina Mills, warrant a finding that Kayser–Roth was an

'operator' for CERCLA purposes within the provisions of 42 U.S.C. 9607." *Id.*

That conclusion is entirely consistent with *Bestfoods'* holding that to be an "operator," one "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876.

■ *Bestfoods* also makes clear that the imposition of operator liability does not require a finding that the parent directly participated in the day-to-day activities at the hazardous waste facility. *Bestfoods* recognizes that operator liability may be imposed when the parent controls the manner in which a subsidiary manages the facility. As the Supreme Court so aptly put it: "[T]he verb 'to operate' . . . obviously mean[s] something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of discretion over the facility's activities." 524 U.S. at 71, 118 S.Ct. 1876.

Nor is there any doubt that, under *Bestfoods,* indirect or derivative operator liability, as well as owner liability, may be predicated on a parent's control over a subsidiary, itself, if that control is sufficiently pervasive and wielded for an improper purpose. *Id.* at 63–64, 118 S.Ct. 1876. As the Supreme Court stated:

> "Some courts and commentators have suggested that this indirect, veil-piercing approach can subject a parent corporation to liability only as an owner, and not as an operator. . . . We think it is otherwise, however. If a subsidiary that operates, but does not own, a facility is so pervasively controlled by its parent for a sufficiently improper purpose to warrant veil piercing, the parent may be held derivatively liable for the subsidiary's acts as an operator."

*Id.* at n. 10.

Here, Judge Boyle expressly found that Kayser–Roth directed Stamina Mills's ac-

tivities with respect to environmental matters, in general, and operation of the facility utilizing TCE, in particular. Judge Boyle also found that Kayser–Roth had directed activities at the site. Consequently, *Bestfoods* would not alter his determination of "operator" liability as affirmed by the First Circuit.

B. *Owner Liability*

Even if there were reason to believe that *Bestfoods* would alter the finding of "operator" liability, vacating the 1990 judgment would be "an empty exercise" because Judge Boyle also found Kayser–Roth liable as an "owner" of the facility.

Kayser–Roth argues that the portion of Judge Boyle's decision finding "owner" liability is not binding because it never was affirmed by the First Circuit and, that, in any event, the test of owner liability that Judge Boyle utilized was rejected in *Bestfoods.* Neither of those arguments is persuasive.

1. *Law of the Case*

■ The fact that the First Circuit did not reach the issue of "owner" liability adds little to the analysis of whether the 1990 declaratory judgment should be vacated. Kayser–Roth correctly points out that, when a district court judgment is based on alternative grounds and the Court of Appeals affirms on one ground but does not address the second ground, the second ground has no preclusive effect for *res judicata* purposes. However, Kayser–Roth overlooks the fact that the district court's decision with respect to the second ground remains the law of the case; and, therefore, may not simply be ignored.

■ Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Christianson v. Colt Indus.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

The law of the case doctrine is "grounded in important considerations related to stability in the decisionmaking process, predictability of results, proper working relationships between trial and appellate courts, and judicial economy." *United States v. Rivera–Martinez*, 931 F.2d 148, 151 (1st Cir.1991). Therefore, although the doctrine is not an absolute bar to reconsidering issues previously decided, "as a rule courts should be loathe to do so in the absence of extraordinary circumstances." *Christianson*, 486 U.S. at 817, 108 S.Ct. 2166. *See also American Title Ins. Co. v. East West Fin. Corp.*, 817 F.Supp. 251, 257 (D.R.I.1993)(stating that re-litigating matters previously decided, without a compelling reason, "would be inconsistent with the 'law of the case' doctrine and the objectives of judicial economy and finality that it serves."), *rev'd in part on other grounds*, 16 F.3d 449 (1st Cir.1994).

■■■■ Extraordinary circumstances exist when the decision was "clearly erroneous and would work a manifest injustice." *Christianson*, 486 U.S. at 817, 108 S.Ct. 2166. A material change in controlling legal authority or the discovery of new evidence likely to alter the result may create extraordinary circumstances. *See Rivera–Martinez*, 931 F.2d at 151; *American Title Ins.*, 817 F.Supp. at 257 (citing *United States v. Bell*, 988 F.2d 247, 251 (1st Cir.1993)). *See also* 18 J. Moore et al, *Moore's Federal Practice* § 134.21[1], at 134–49 (3d ed.1997).

The decision regarding whether or not to revisit a previously decided issue also is affected by the stage of the case at which the request is made and the extent to which the opposing party may be prejudiced. For example, ordinarily, reluctance to re-examine rulings is less at the pretrial stage when the interest in finality is less compelling and the opposing party has ample opportunity to deal with the change than it is after the entry of a judgment upon which the parties may have relied when it may be too late for them to adjust.

*See Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir.1999). In this case, since relief is being sought several years after judgment was entered, Kayser–Roth bears a heightened burden of demonstrating extraordinary circumstances.

Some confusion regarding the contours of the law-of-the-case doctrine arises from the fact that the doctrine is applied in a variety of different circumstances. It may refer to such disparate obligations as a trial court's duty to adhere to rulings of an appellate court made in the same case; the deference due from one judge to rulings made in the same case by another judge of the same court or a judge of a coordinate court; or the responsibility to promote stability and efficiency by refusing to reconsider its own rulings absent a compelling reason for doing so. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 4478, at 788–801, 874–973 (1981 & 1999 supp.); *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1992).

■■■■ Generally, "when a higher court reverses [on] one ground and remands a case without disturbing other determinations made by a lower court, the determinations not reversed continue to be the law of the case." *American Title Ins.*, 817 F.Supp. at 257 (citation omitted). That is precisely the situation presented in this case.

■■■ The fact that the determination of "owner" liability was made by Judge Boyle is immaterial because the law of the case doctrine applies to decisions of other judges on the same court and judges of coordinate courts to the same extent as it applies to a court's own decisions. *See Williams v. Commissioner of Internal Revenue*, 1 F.3d 502, 503 (7th Cir.1993)(stating that "[l]itigants have a right to expect that a change in judges will not mean going back to square one."); *Moore* § 134.22[1][c]. A judge should revisit issues previously decided by another judge only for reasons that would warrant

revisiting his or her own rulings and not "merely because he has a different view of the law or the facts from the first judge." *Williams*, 1 F.3d at 503.

Thus, the issue is whether Kayser–Roth has made a showing of extraordinary circumstances sufficient to overcome the law-of-the-case doctrine. More specifically, the question is whether, under *Bestfoods*, Judge Boyle's finding of "owner" liability can be described as one that is "clearly erroneous and would work a manifest injustice."

### 2. *Bestfoods*

CERCLA, itself, provides little guidance for determining "owner" or "operator" liability. As the Supreme Court has noted, the "phrase 'owner or operator' is defined only by tautology . . . as 'any person owning or operating' a facility." *Bestfoods*, 524 U.S. at 56, 118 S.Ct. 1876 (quoting 42 U.S.C. § 9601(20)(A)(ii)), a definition that the Court described as a "bit of circularity." 524 U.S. at 56, 118 S.Ct. 1876.

Here, Judge Boyle's finding of "owner" liability was based on a determination that Stamina Mills' corporate veil should be pierced. The doctrine of piercing the corporate veil is one of the most amorphous doctrines in the law because it is multifaceted and serves a variety of purposes that vary from case to case. *See Doe v. Gelineau*, 732 A.2d 43 (R.I.1999); *Miller v. Dixon Indus. Corp.*, 513 A.2d 597, 604 (R.I.1986).

One ground for piercing the corporate veil is that "the corporation is something less than a bona fide independent entity." *United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 744 (8th Cir. 1986). For example, when the principals, themselves, fail to treat the corporation as a separate and distinct entity by not adequately capitalizing it, failing to hold directors' and shareholders' meetings and/or co-mingling corporate and non-corporate assets, the corporate form may be disregarded. *See 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations* § 41.30 (perm. ed. rev. vol.1999).

■■■ Similarly, the corporate veil between a parent corporation and its subsidiary may be pierced if it is "demonstrated that the parent dominated the finances, policies and practices of the subsidiary." *Miller*, 513 A.2d at 604. In the parent-subsidiary context, the test is whether stock ownership was "not for the purpose of participating in the affairs of the corporation in the normal and usual manner but for the purpose . . . of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company." *Bestfoods*, 524 U.S. at 62, 118 S.Ct. 1876 (citing *Chicago, M. & St. P.R. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918)).

Fraud is another ground recognized at common law for piercing the corporate veil. *See R & B Elec. Co. v. Amco Constr. Co.*, 471 A.2d 1351, 1354 (R.I.1984). Thus, the corporate form may be disregarded when it is "misused to accomplish certain wrongful purposes, most notably fraud, on the shareholders' behalf." *Bestfoods*, 524 U.S. at 62, 118 S.Ct. 1876.

Although failure to treat a corporation as a bona fide independent entity or using it to perpetrate a fraud are the two most common and easily defined grounds for piercing the corporate veil, they are not the only grounds. It has been held that the corporate form also may be disregarded when it is used to "defeat public convenience, justify wrong, protect fraud or defend crime." *R & B Elec. Co.*, 471 A.2d at 1354, or when it is "unjust and inequitable to consider the subject corporation a separate entity." *Gelineau*, 732 A.2d at 48 (quoting *R & B Elec. Co.*, 471 A.2d at 1354).

■■■ Judge Boyle's decision to pierce Stamina Mills's veil rested on two factors: (1) Kayser–Roth's pervasive control over Stamina Mills which rendered Stamina

Mills something less than a "bona fide independent entity," especially with respect to environmental matters; *see* 724 F.Supp. at 23; and (2) considerations of "public convenience, fairness and equity," including the desire to further CERCLA's remedial purpose by liberally construing its provisions. *Id.* at 24.

Kayser–Roth asserts that *Bestfoods* rejected those criteria and that, under *Bestfoods,* a corporate veil may be pierced *only* when there is evidence that the corporate form has been abused to accomplish fraud or some other wrongful purpose. That assertion represents an apparent misreading of *Bestfoods.*

Kayser–Roth relies on a statement in *Bestfoods* that a corporate veil may be pierced "when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." 524 U.S. at 62, 118 S.Ct. 1876 (emphasis added). However, Kayser–Roth ignores the fact that the term "inter alia" is a term of inclusion and not a term of limitation. It means "among other things," Black's Law Dictionary 815, and connotes an illustrative example rather than an exhaustive list. Consequently, in using that term, the Supreme Court indicated that fraud was only one of the grounds for piercing a corporate veil and not a *sine qua non.*

Moreover, in making the statement relied upon by Kayser–Roth, the Supreme Court cited *Chicago M. & St. P.R. Co. v. Minneapolis Civic and Commerce Ass'n.,* a case in which a subsidiary corporation's veil was pierced because the parent exercised such control that the subsidiary was its "mere agency or instrumentality." *See Bestfoods,* 524 U.S. at 62, 118 S.Ct. 1876 (quoting *Chicago M.,* 247 U.S. at 501, 38 S.Ct. 553).

■ Indeed, *Bestfoods* expressly recognizes that, while general control over a subsidiary is not, by itself, sufficient to make a parent corporation *directly* liable as the "operator" of a facility run by its subsidiary, "[c]ontrol of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine." 524 U.S. at 67, 118 S.Ct. 1876 (emphasis added). *See also id.* at 64 n. 10, 118 S.Ct. 1876.

In short, *Bestfoods* did not, as Kayser–Roth claims, reject the veil-piercing criteria utilized by Judge Boyle. On the contrary, it specifically recognized that veil piercing may be justified where a parent corporation exercises the nature and degree of control over a subsidiary that Judge Boyle supportably found to exist in this case. Therefore, Judge Boyle's determination of owner liability remains the law of the case.

### Conclusion

For all the foregoing reasons, Kayser–Roth's motion for relief from judgment pursuant to Rule 60(b)(5) is denied.

IT IS SO ORDERED,